(Slip Opinion)

# House Committees' Authority to Investigate for Impeachment

The House of Representatives must expressly authorize a committee to conduct an impeachment investigation and to use compulsory process in that investigation before the committee may compel the production of documents or testimony in support of the House's power of impeachment.

The House had not authorized an impeachment investigation in connection with impeachment-related subpoenas issued by House committees before October 31, 2019, and the subpoenas therefore had no compulsory effect.

The House's adoption of Resolution 660 on October 31, 2019, did not alter the legal status of those subpoenas, because the resolution did not ratify or otherwise address their terms.

January 19, 2020

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

On September 24, 2019, Speaker of the House Nancy Pelosi "announc[ed]" at a press conference that "the House of Representatives is moving forward with an official impeachment inquiry" into the President's actions and that she was "directing . . . six Committees to proceed with" several previously pending "investigations under that umbrella of impeachment inquiry."[1] Shortly thereafter, the House Committee on Foreign Affairs issued a subpoena directing the Secretary of State to produce a series of documents related to the recent conduct of diplomacy between the United States and Ukraine. *See* Subpoena of the Committee on Foreign Affairs (Sept. 27, 2019). In an accompanying letter, three committee chairmen stated that their committees jointly sought these documents, not in connection with legislative oversight, but "[p]ursuant to the House of Representatives' impeachment inquiry."[2] In the following days, the committees issued subpoenas to the Acting White House Chief

---

[1] Nancy Pelosi, Speaker of the House, *Press Release: Pelosi Remarks Announcing Impeachment Inquiry* (Sept. 24, 2019), www.speaker.gov/newsroom/92419-0 ("Pelosi Press Release").

[2] Letter for Michael R. Pompeo, Secretary of State, from Eliot L. Engel, Chairman, Committee on Foreign Affairs, U.S. House of Representatives, Adam Schiff, Chairman, Permanent Select Committee on Intelligence, U.S. House of Representatives, and Elijah E. Cummings, Chairman, Committee on Oversight & Reform, U.S. House of Representatives at 1 (Sept. 27, 2019) ("Three Chairmen's Letter").

of Staff, the Secretary of Defense, the Secretary of Energy, and several others within the Executive Branch.

Upon the issuance of these subpoenas, you asked whether these committees could compel the production of documents and testimony in furtherance of an asserted impeachment inquiry. We advised that the committees lacked such authority because, at the time the subpoenas were issued, the House had not adopted any resolution authorizing the committees to conduct an impeachment inquiry. The Constitution vests the "sole Power of Impeachment" in the House of Representatives. U.S. Const. art. I, § 2, cl. 5. For precisely that reason, the House itself must authorize an impeachment inquiry, as it has done in virtually every prior impeachment investigation in our Nation's history, including every one involving a President. A congressional committee's "right to exact testimony and to call for the production of documents" is limited by the "controlling charter" the committee has received from the House. *United States v. Rumely*, 345 U.S. 41, 44 (1953). Yet the House, by its rules, has authorized its committees to issue subpoenas only for matters within their *legislative* jurisdiction. Accordingly, no committee may undertake the momentous move from legislative oversight to impeachment without a delegation by the full House of such authority.

We are not the first to reach this conclusion. This was the position of the House in the impeachments of Presidents Nixon and Clinton. In the case of President Nixon, following a preliminary inquiry, the House adopted a formal resolution as a "necessary step" to confer the "investigative powers" of the House "to their full extent" upon the Judiciary Committee. 120 Cong. Rec. 2350–51 (1974) (statement of Rep. Rodino); *see* H.R. Res. 803, 93d Cong. (1974). As the House Parliamentarian explained, it had been "considered necessary for the House to specifically vest the Committee on the Judiciary with the investigatory and subpena power to conduct the impeachment investigation." 3 Lewis Deschler, *Deschler's Precedents of the United States House of Representatives* ch. 14, § 15.2, at 2172 (1994) (Parliamentarian's Note).[3] The House followed the same course in the impeachment of President Clinton. After reviewing the Independent Counsel's referral, the Judiciary Committee "decided that it must receive authorization from the full House before proceeding on

---

[3] Although volume 3 of *Deschler's Precedents* was published in 1979, our citations of *Deschler's Precedents* use the continuously paginated version that is available at www. govinfo.gov/collection/precedents-of-the-house.

any further course of action." H.R. Rep. No. 105-795, at 24 (1998). The House again adopted a resolution authorizing the committee to issue compulsory process in support of an impeachment investigation. *See* H.R. Res. 581, 105th Cong. (1998). As Representative John Conyers summarized in 2016: "According to parliamentarians of the House past and present, the impeachment process does not begin until the House actually votes to authorize [a] Committee to investigate the charges."[4]

In marked contrast with these historical precedents, in the weeks after the Speaker's announcement, House committees issued subpoenas without any House vote authorizing them to exercise the House's authority under the Impeachment Clause. The three committees justified the subpoenas based upon the Rules of the House, which authorize subpoenas for matters within a committee's jurisdiction. But the Rules assign only "legislative jurisdiction[]" and "oversight responsibilities" to the committees. H.R. Rules, 116th Cong., Rule X, cl. 1 (Jan. 11, 2019) ("Committees and their legislative jurisdictions"), cl. 2 ("General oversight responsibilities"); *see also* H.R. Rule X, cls. 3(m), 11. The House's legislative power is distinct from its impeachment power. *Compare* U.S. Const. art. I, § 1, *with id.* art. I, § 2, cl. 5. Although committees had that same delegation during the Clinton impeachment and a materially similar one during the Nixon impeachment, the House determined on both occasions that the Judiciary Committee required a resolution to investigate. Speaker Pelosi purported to direct the committees to conduct an "official impeachment inquiry," but the House Rules do not give the Speaker any authority to delegate investigative power. The committees thus had no delegation authorizing them to issue subpoenas pursuant to the House's impeachment power.

In the face of objections to the validity of the committee subpoenas that were expressed by the Administration, by ranking minority members in the House, and by many Senators, among others, on October 31, 2019, the House adopted Resolution 660, which "directed" six committees "to continue their ongoing investigations" as part of the "existing House of Representatives inquiry into whether sufficient grounds exist" to impeach President Trump. H.R. Res. 660, 116th Cong. § 1 (2019). Resolution 660's direction, however, was entirely prospective. The resolution did not purport to ratify any previously issued subpoenas or even make any men-

---

[4] *Impeachment Articles Referred on John Koskinen (Part III): Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 3 (2016).

tion of them. Accordingly, the pre-October 31 subpoenas, which had not been authorized by the House, continued to lack compulsory force.[5]

# I.

Since the start of the 116th Congress, some members of Congress have proposed that the House investigate and impeach President Trump. On January 3, 2019, the first day of the new Congress, Representative Brad Sherman introduced a resolution to impeach "Donald John Trump, President of the United States, for high crimes and misdemeanors." H.R. Res. 13, 116th Cong. (2019). The Sherman resolution called for impeachment based upon the President's firing of the Director of the Federal Bureau of Investigation, James Comey. *See id.* Consistent with settled practice, the resolution was referred to the Judiciary Committee. *See* H.R. Doc. No. 115-177, *Jefferson's Manual* § 605, at 324 (2019).

The Judiciary Committee did not act on the Sherman resolution, but it soon began an oversight investigation into related subjects that were also the focus of a Department of Justice investigation by Special Counsel Robert S. Mueller, III. On March 4, 2019, the committee served document requests on the White House and 80 other agencies, entities, and individuals, "unveil[ing] an investigation . . . into the alleged obstruction of justice, public corruption, and other abuses of power by President Trump, his associates, and members of his Administration."[6] Those document requests did not mention impeachment.

After the Special Counsel finished his investigation, the Judiciary Committee demanded his investigative files, describing its request as an

---

[5] This opinion memorializes the advice we gave about subpoenas issued before October 31. We separately addressed some subpoenas issued after that date. *See, e.g.*, Letter for Pat A. Cipollone, Counsel to the President, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel (Nov. 7, 2019) (subpoena to Mick Mulvaney); Letter for Pat A. Cipollone, Counsel to the President, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel (Nov. 3, 2019) (subpoena to John Eisenberg); *Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __ (Nov. 1, 2019).

[6] U.S. House of Representatives Committee on the Judiciary, *Press Release: House Judiciary Committee Unveils Investigation into Threats Against the Rule of Law* (Mar. 4, 2019), judiciary.house.gov/news/press-releases/house-judiciary-committee-unveils-investigation-threats-against-rule-law; *see also* Letter for the White House, c/o Pat Cipollone, from Jerrold Nadler, Chairman, Committee on the Judiciary, U.S. House of Representatives (Mar. 4, 2019).

exercise of legislative oversight authority. *See* Letter for William P. Barr, Attorney General, from Jerrold Nadler, Chairman, Committee on the Judiciary, U.S. House of Representatives at 3 (May 3, 2019) (asserting that "[t]he Committee has ample jurisdiction under House Rule X(*l*) to conduct oversight of the Department [of Justice], undertake necessary investigations, and consider legislation regarding the federal obstruction of justice statutes, campaign-related crimes, and special counsel investigations, among other things"). The committee's subsequent letters and public statements likewise described its inquiry as serving a "legislative purpose." *E.g.*, Letter for Pat Cipollone, White House Counsel, from Jerrold Nadler, Chairman, Committee on the Judiciary, U.S. House of Representatives at 3–6 (May 16, 2019) (describing the "legislative purpose of the Committee's investigation" (capitalization altered)).

Over time, the Judiciary Committee expanded the description of its investigation to claim that it was considering impeachment. The committee first mentioned impeachment in a May 8, 2019 report recommending that the Attorney General be held in contempt of Congress. In a section entitled "Authority and Legislative Purpose," the committee stated that one purpose of the inquiry was to determine "whether to approve articles of impeachment with respect to the President or any other Administration official." H.R. Rep. No. 116-105, at 12, 13 (2019).[7]

The committee formally claimed to be investigating impeachment when it petitioned the U.S. District Court for the District of Columbia to release grand-jury information related to the Special Counsel's investigation. *See* Application at 1–2, *In re Application of the Comm. on the Judiciary, U.S.*

---

[7] On June 11, 2019, the full House adopted Resolution 430. Its first two clauses authorized the Judiciary Committee to file a lawsuit to enforce subpoenas against Attorney General William Barr and former White House Counsel Donald McGahn and purported to authorize the Bipartisan Legal Advisory Group to approve future litigation. *See* H.R. Res. 430, 116th Cong. (2019). The next clause of the resolution then stated that, "in connection with any judicial proceeding brought under the first or second resolving clauses, the chair of any standing or permanent select committee exercising authority thereunder has any and all necessary authority under Article I of the Constitution." *Id.* The resolution did not mention "impeachment" and, by its terms, authorized actions only in connection with the litigation authorized "under the first or second resolving clauses." On the same day that the House adopted Resolution 430, Speaker Pelosi stated that the House's Democratic caucus was "not even close" to an impeachment inquiry. *Rep. Nancy Pelosi (D-CA) Continues Resisting Impeachment Inquiry*, CNN (June 11, 2019), transcripts.cnn.com/ TRANSCRIPTS/1906/11/cnr.04.html.

*House of Reps.*, No. 19-gj-48 (D.D.C. July 26, 2019); *see also* Memorandum for Members of the Committee on the Judiciary from Jerrold Nadler, Chairman, *Re: Lessons from the Mueller Report, Part III: "Constitutional Processes for Addressing Presidential Misconduct"* at 3 (July 11, 2019) (advising that the Committee would seek documents and testimony "to determine whether the Committee should recommend articles of impeachment against the President or any other Article I remedies, and if so, in what form").[8] The committee advanced the same contention when asking the district court to compel testimony before the committee by former White House Counsel Donald McGahn. *See* Compl. for Declaratory and Injunctive Relief ¶ 1, *Comm. on the Judiciary, U.S. House of Reps. v. McGahn*, No. 19-cv-2379 (D.D.C. Aug. 7, 2019) (contending that the Judiciary Committee was "now determining whether to recommend articles of impeachment against the President based on the obstructive conduct described by the Special Counsel").

In connection with this litigation, Chairman Nadler described the committee as conducting "formal impeachment proceedings." David Priess & Margaret Taylor, *What if the House Held Impeachment Proceedings and Nobody Noticed?*, Lawfare (Aug. 12, 2019), www.lawfareblog.com/what-if-house-held-impeachment-proceedings-and-nobody-noticed (chronicling the evolution in Chairman Nadler's descriptions of the investigation). Those assertions coincided with media reports that Chairman Nadler had privately asked Speaker Pelosi to support the opening of an impeachment inquiry. *See, e.g.*, Andrew Desiderio, *Nadler: 'This is Formal Impeachment Proceedings*,' Politico (Aug. 8, 2019), www.politico.com/story/2019/08/08/nadler-this-is-formal-impeachment-proceedings-1454360 (noting that Nadler "has privately pushed Speaker Nancy Pelosi to support a formal inquiry of whether to remove the president from office"). On September 12, the Judiciary Committee approved a resolution describing its investigation as an impeachment inquiry and adopting certain procedures for the investigation. *See* Resolution for Investigative Procedures Offered by Chairman Jerrold Nadler, H. Comm. on the Judiciary, 116th

---

[8] While the House has delegated to the Bipartisan Legal Advisory Group the ability to "articulate[] the institutional position of" the House, it has done so only for purposes of "litigation matters." H.R. Rule II, cl. 8(b). Therefore, neither the group, nor the House counsel implementing that group's directions, could assert the House's authority in connection with an impeachment investigation, which is not a litigation matter.

Cong. (Sept. 12, 2019), docs.house.gov/meetings/JU/JU00/20190912/109921/BILLS-116pih-ResolutionforInvestigativeProcedures.pdf.

Speaker Pelosi did not endorse the Judiciary Committee's characterization of its investigation during the summer of 2019. But she later purported to announce a formal impeachment inquiry in connection with a separate matter arising out of a complaint filed with the Inspector General of the Intelligence Community. The complaint, cast in the form of an unsigned letter to the congressional intelligence committees, alleged that, in a July 25, 2019 telephone call, the President sought to pressure Ukrainian President Volodymyr Zelenskyy to investigate the prior activities of one of the President's potential political rivals. *See* Letter for Richard Burr, Chairman, Select Committee on Intelligence, U.S. Senate, and Adam Schiff, Chairman, Permanent Select Committee on Intelligence, U.S. House of Representatives at 2–3 (Aug. 12, 2019). After the Inspector General reported the existence of the complaint to the intelligence committees, the President declassified the official record of the July 25 telephone call and the complaint, and they were publicly released on September 25 and 26, respectively.

On September 24, the day before the release of the call record, Speaker Pelosi "announc[ed]" that "the House of Representatives is moving forward with an official impeachment inquiry" and that she was "direct[ing] . . . six [c]ommittees to proceed with their investigations under that umbrella of impeachment inquiry." Pelosi Press Release, *supra* note 1. In an October 8, 2019 court hearing, the House's General Counsel invoked the Speaker's announcement as purportedly conclusive proof that the House had opened an impeachment inquiry. Tr. of Mot. Hrg. at 23, *In re Application of the Comm. on the Judiciary* ("We are in an impeachment inquiry, an impeachment investigation, a formal impeachment investigation because the House says it is. The speaker of the House has specifically said that it is.").

On September 27, Chairman Engel of the Foreign Affairs Committee issued a subpoena to Secretary of State Pompeo "[p]ursuant to the House of Representatives' impeachment inquiry." Three Chairmen's Letter, *supra* note 2, at 1. That subpoena was the first to rely on the newly proclaimed "impeachment inquiry." A number of subpoenas followed, each of which was accompanied by a letter signed by the chairmen of three committees (Foreign Affairs, Oversight and Reform, and the Permanent Select Committee on Intelligence ("HPSCI")). Although the September 27 letter mentioned only the "impeachment inquiry" as a basis for the ac-

companying subpoena, subsequent letters claimed that other subpoenas were issued both "[p]ursuant to the House of Representatives' impeachment inquiry" and "in exercise of" the committees' "oversight and legislative jurisdiction."[9]

Following service of these subpoenas, you and other officials within the Executive Branch requested our advice with respect to the obligations of the subpoenas' recipients. We advised that the subpoenas were invalid because, among other reasons, the committees lacked the authority to conduct the purported inquiry and, with respect to several testimonial subpoenas, the committees impermissibly sought to exclude agency counsel from scheduled depositions. In reliance upon that advice, you and other responsible officials directed employees within their respective departments and agencies not to provide the documents and testimony requested under those subpoenas.

On October 8, 2019, you sent a letter to Speaker Pelosi and the three chairmen advising them that their purported impeachment inquiry was "constitutionally invalid" because the House had not authorized it.[10] The House Minority Leader, Kevin McCarthy, and the Ranking Member of the Judiciary Committee, Doug Collins, had already made the same objec-

---

[9] *E.g.*, Letter for John Michael Mulvaney, Acting Chief of Staff to the President, from Elijah E. Cummings, Chairman, Committee on Oversight & Reform, U.S. House of Representatives, Adam B. Schiff, Chairman, Permanent Select Committee on Intelligence, U.S. House of Representatives, and Eliot L. Engel, Chairman, Committee on Foreign Affairs, U.S. House of Representatives at 1 (Oct. 4, 2019); Letter for Mark T. Esper, Secretary of Defense, from Adam B. Schiff, Chairman, Permanent Select Committee on Intelligence, U.S. House of Representatives, Eliot L. Engel, Chairman, Committee on Foreign Affairs, U.S. House of Representatives, and Elijah E. Cummings, Chairman, Committee on Oversight & Reform, U.S. House of Representatives at 1 (Oct. 7, 2019); Letter for Gordon Sondland, U.S. Ambassador to the European Union, from Adam B. Schiff, Chairman, Permanent Select Committee on Intelligence, U.S. House of Representatives, Elijah E. Cummings, Chairman, Committee on Oversight & Reform, U.S. House of Representatives, and Eliot L. Engel, Chairman, Committee on Foreign Affairs, U.S. House of Representatives at 1 (Oct. 8, 2019); Letter for James Richard "Rick" Perry, Secretary of Energy, from Eliot L. Engel, Chairman, Committee on Foreign Affairs, U.S. House of Representatives, Adam B. Schiff, Chairman, Permanent Select Committee on Intelligence, U.S. House of Representatives, and Elijah E. Cummings, Chairman, Committee on Oversight & Reform, U.S. House of Representatives at 1 (Oct. 10, 2019).

[10] Letter for Nancy Pelosi, Speaker, U.S. House of Representatives, et al., from Pat A. Cipollone, Counsel to the President at 2–3 (Oct. 8, 2019).

tion.[11] Senator Lindsey Graham introduced a resolution in the Senate, co-sponsored by 49 other Senators, which objected to the House's impeachment process because it had not been authorized by the full House and did not provide the President with the procedural protections enjoyed in past impeachment inquiries. S. Res. 378, 116th Cong. (2019).

On October 25, 2019, the U.S. District Court for the District of Columbia granted the Judiciary Committee's request for grand-jury information from the Special Counsel's investigation, holding that the committee was conducting an impeachment inquiry that was "preliminar[y] to . . . a judicial proceeding," for purposes of the exception to grand-jury secrecy in Rule 6(e)(3)(E)(i) of the Federal Rules of Criminal Procedure. *See In re Application of the Comm. on the Judiciary, U.S. House of Reps.*, No. 19-gj-48, 2019 WL 5485221 (D.D.C. Oct. 25, 2019), *stay granted*, No. 19-5288 (D.C. Cir. Oct. 29, 2019), *argued* (D.C. Cir. Jan. 3, 2020). In so holding, the court concluded that the House need not adopt a resolution before a committee may begin an impeachment inquiry. *Id*. at *26–28. As we discuss below, the district court's analysis of this point relied on a misreading of the historical record.

Faced with continuing objections from the Administration and members of Congress to the validity of the impeachment-related subpoenas, the House decided to take a formal vote to authorize the impeachment inquiry. *See* Letter for Democratic Members of the House from Nancy Pelosi, Speaker of the House (Oct. 28, 2019). On October 31, the House adopted a resolution "direct[ing]" several committees "to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America." Resolution 660, § 1. The resolution also adopted special procedures for impeachment proceedings before HPSCI and the Judiciary Committee.

---

[11] *See* Letter for Nancy Pelosi, Speaker, U.S. House of Representatives, from Kevin McCarthy, Republican Leader, U.S. House of Representatives at 1 & n.1 (Oct. 3, 2019); Mem. Amicus Curiae of Ranking Member Doug Collins in Support of Denial at 5–21, *In re Application of the Comm. on the Judiciary* (D.D.C. Oct. 3, 2019).

## II.

The Constitution vests in the House of Representatives a share of Congress's legislative power and, separately, "the sole Power of Impeachment." U.S. Const. art. I, § 1; *id*. art. I, § 2, cl. 5. Both the legislative power and the impeachment power include an implied authority to investigate, including by means of compulsory process. But those investigative powers are not interchangeable. The House has broadly delegated to committees its power to investigate for legislative purposes, but it has held impeachment authority more closely, granting authority to conduct particular impeachment investigations only as the need has arisen. The House has followed that approach from the very first impeachment inquiry through dozens more that have followed over the past 200 years, including every inquiry involving a President.

In so doing, the House has recognized the fundamental difference between a legislative oversight investigation and an impeachment investigation. The House does more than simply pick a label when it "debate[s] and decide[s] when it wishes to shift from legislating to impeaching" and to authorize a committee to take responsibility for "the grave and weighty process of impeachment." *Trump v. Mazars USA, LLP*, 940 F.3d 710, 737, 738 (D.C. Cir. 2019), *cert. granted*, No. 19-715 (Dec. 13, 2019); *see also id.* at 757 (Rao, J., dissenting) (recognizing that "the Constitution forces the House to take accountability for its actions when investigating the President's misconduct"). Because a legislative investigation seeks "information respecting the conditions which the legislation is intended to affect or change," *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927), "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events," *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974) (en banc). By contrast, an impeachment inquiry must evaluate whether a civil officer did, or did not, commit treason, bribery, or another high crime or misdemeanor, U.S. Const. art. II, § 4, and it is more likely than a legislative oversight investigation to call for the reconstruction of past events.

Thus, the House has traditionally marked the shift to an impeachment inquiry by adopting a resolution that authorizes a committee to investigate through court-like procedures differing significantly from those used in routine oversight. *See, e.g.*, *Jefferson's Manual* § 606, at 324 (recognizing

that, in modern practice, "the sentiment of committees has been in favor of permitting the accused to explain, present witnesses, cross-examine, and be represented by counsel" (citations omitted)); *see also* Cong. Research Serv., R45983, *Congressional Access to Information in an Impeachment Investigation* 15 (Oct. 25, 2019) ("[D]uring both the Nixon and Clinton impeachment investigations, the House Judiciary Committee adopted resolutions affording the President and his counsel the right to respond to evidence gathered by the committee, raise objections to testimony, and cross-examine witnesses[.]").[12] A House resolution authorizing the opening of an impeachment inquiry plays a highly significant role in directing the scope and nature of the constitutional inquest that follows.

Such a resolution does not just reflect traditional practice. It is a constitutionally required step before a committee may exercise compulsory process in aid of the House's "sole Power of Impeachment." U.S. Const. art. I, § 2, cl. 5. In this Part, we explain the basis for this conclusion. First, we address the constitutional distinction between the House's power to investigate for legislative purposes and for impeachment purposes. We next explain why an impeachment inquiry must be authorized by the House itself. Finally, we review the historical record, which confirms, across dozens of examples, that the House must specifically authorize

---

[12] The House Judiciary Committee permitted President Nixon's counsel to submit and respond to evidence, to request to call witnesses, to attend hearings and examinations, to object to the examination of witnesses and the admissibility of testimony, and to question witnesses. *See* H.R. Rep. No. 93-1305, at 8–9 (1974); 3 *Deschler's Precedents* ch. 14, § 6.5, at 2045–47. Later, President Clinton and his counsel were similarly "invited to attend all executive session and open committee hearings," at which they were permitted to "cross examine witnesses," "make objections regarding the pertinency of evidence," "suggest that the Committee receive additional evidence," and "respond to the evidence adduced by the Committee." H.R. Rep. No. 105-795, at 25–26; *see also* 18 *Deschler's Precedents* app. at 549 (2013) (noting that, during the Clinton impeachment investigation, the House made a "deliberate attempt to mirror [the] documented precedents and proceedings" of the Nixon investigation). In a departure from the Nixon and Clinton precedents, the House committees did not provide President Trump with any right to attend, participate in, or cross-examine witnesses in connection with the impeachment-related depositions conducted by the three committees before October 31. Resolution 660 similarly did not provide any such rights with respect to any of the public hearings conducted by HPSCI, limiting the President's opportunity to participate to the Judiciary Committee, which did not itself participate in developing the investigative record upon which the articles of impeachment were premised. *See* H.R. Res. 660, 116th Cong. § 4(a); 165 Cong. Rec. E1357 (daily ed. Oct. 29, 2019) ("Impeachment Inquiry Procedures in the Committee on the Judiciary").

committees to conduct impeachment investigations and to issue compulsory process.

## A.

The Constitution vests several different powers in the House of Representatives. As one half of Congress, the House shares with the Senate the "legislative Powers" granted in the Constitution (U.S. Const. art. I, § 1), which include the ability to pass bills (*id*. art. I, § 7, cl. 2) and to override presidential vetoes (*id*. art. I, § 7, cl. 3) in the process of enacting laws pursuant to Congress's enumerated legislative powers (*e.g.*, *id*. art. I, § 8), including the power to appropriate federal funds (*id*. art. I, § 9, cl. 7). But the House has other, non-legislative powers. It is, for instance, "the Judge of the Elections, Returns and Qualifications of its own Members." *Id*. art. I, § 5, cl. 1. And it has "the sole Power of Impeachment." *Id*. art. I, § 2, cl. 5.

The House and Senate do not act in a legislative role in connection with impeachment. The Constitution vests the House with the authority to accuse civil officers of "Treason, Bribery, or other high Crimes and Misdemeanors" that warrant removal and disqualification from office. U.S. Const. art. I, § 2, cl. 5; *id*. art. I, § 3, cl. 7; *id*. art. II, § 4. As Alexander Hamilton explained, the members of the House act as "the inquisitors for the nation." *The Federalist* No. 65, at 440 (Jacob E. Cooke ed., 1961). And Senators, in turn, act "in their judicial character as a court for the trial of impeachments." *Id.* at 439; *see also The Federalist* No. 66, at 445–46 (defending the "partial intermixture" in the impeachment context of usually separated powers as "not only proper, but necessary to the mutual defense of the several members of the government, against each other"; noting that dividing "the right of accusing" from "the right of judging" between "the two branches of the legislature . . . avoids the inconvenience of making the same persons both accusers and judges"). The House's impeachment authority differs fundamentally in character from its legislative power.

With respect to both its legislative and its impeachment powers, the House has corresponding powers of investigation, which enable it to collect the information necessary for the exercise of those powers. The Supreme Court has explained that "[t]he power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *McGrain*, 273 U.S. at 174. Thus, in the legislative context,

the House's investigative power "encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes." *Watkins v. United States*, 354 U.S. 178, 187 (1957); *see also Scope of Congressional Oversight and Investigative Power with Respect to the Executive Branch*, 9 Op. O.L.C. 60, 60 (1985) ("Congress may conduct investigations in order to obtain facts pertinent to possible legislation and in order to evaluate the effectiveness of current laws."). The Court has further recognized that the House also has implied powers to investigate in support of its other powers, including its power of impeachment. *See, e.g.*, *Kilbourn v. Thompson*, 103 U.S. 168, 190 (1880); *see also In re Request for Access to Grand Jury Materials*, 833 F.2d 1438, 1445 (11th Cir. 1987) (the House "holds investigative powers that are ancillary to its impeachment power"); *Mazars USA*, 940 F.3d at 749 (Rao, J., dissenting) ("The House . . . has a separate power to investigate pursuant to impeachment[.]").

Because the House has different investigative powers, establishing which authority has been delegated has often been necessary in the course of determining the scope of a committee's authority to compel witnesses and testimony. In addressing the scope of the House's investigative powers, all three branches of the federal government have recognized the constitutional distinction between a legislative investigation and an impeachment inquiry.

## 1.

We begin with the federal courts. In *Kilbourn*, the Supreme Court held that a House committee could not investigate a bankrupt company indebted to the United States because its request exceeded the scope of the legislative power. According to the Court, the committee had employed investigative power to promote the United States' interests as a creditor, rather than for any valid legislative purpose. *See* 103 U.S. at 192–95. At the same time, the Court conceded that "the whole aspect of the case would have been changed" if "any purpose had been avowed to impeach the [S]ecretary" of the Navy for mishandling the debts of the United States. *Id.* at 193. But, after reviewing the resolution authorizing the actions of the committee, the Court confirmed that the House had not authorized any impeachment inquiry. *Id.*

In a similar vein, the D.C. Circuit distinguished the needs of the House Judiciary Committee, which was conducting an impeachment inquiry into

the actions of President Nixon, from those of the Senate Select Committee on Presidential Campaign Activities, whose investigation was premised upon legislative oversight. *See Senate Select Comm.*, 498 F.2d at 732. The court recognized that the impeachment investigation was rooted in "an express constitutional source" and that the House committee's investigative needs differed in kind from the Senate committee's oversight needs. *Id.* In finding that the Senate committee had not demonstrated that President Nixon's audiotapes were "critical to the performance of its legislative functions," the court recognized "a clear difference between Congress's *legislative* tasks and the responsibility of a grand jury, *or any institution engaged in like functions*," such as the House Judiciary Committee, which had "begun an inquiry into presidential impeachment." *Id.* (emphases added).

More recently, the D.C. Circuit acknowledged this same distinction in *Mazars USA*. As the majority opinion explained, "the Constitution has left to Congress the judgment whether to commence the impeachment process" and to decide whether the conduct in question is "better addressed through oversight and legislation than impeachment." 940 F.3d at 739. Judge Rao's dissent also recognized the distinction between a legislative oversight investigation and an impeachment inquiry. *See id.* at 757 ("The Framers established a mechanism for Congress to hold even the highest officials accountable, but also required the House to take responsibility for invoking this power."). Judge Rao disagreed with the majority insofar as she understood Congress's impeachment power to be the sole means for investigating past misconduct by impeachable officers. But both the majority and the dissent agreed with the fundamental proposition that the Constitution distinguishes between investigations pursuant to the House's impeachment authority and those that serve its legislative authority (including oversight).

## 2.

The Executive Branch similarly has long distinguished between investigations for legislative and for impeachment purposes. In 1796, the House "[r]esolved" that President Washington "be requested to lay before th[e] House a copy of the instructions" given to John Jay in preparation for his negotiation of a peace settlement with Great Britain. 5 Annals of Cong. 759–62 (1796). Washington refused to comply because the Constitution contemplates that only the Senate, not the House, must consent to

a treaty. *See id.* at 760–61. "It d[id] not occur" to Washington "that the inspection of the papers asked for, c[ould] be relative to any purpose under the cognizance of the House of Representatives, *except that of an impeachment*." *Id.* at 760 (emphasis added). Because the House's "resolution ha[d] not expressed" any purpose of pursuing impeachment, Washington concluded that "a just regard to the constitution . . . forb[ade] a compliance with [the House's] request" for documents. *Id.* at 760, 762.

In 1832, President Jackson drew the same line. A select committee of the House had requested that the Secretary of War "furnish[]" it "with a copy" of an unratified 1830 treaty with the Chickasaw Tribe and "the journal of the commissioners" who negotiated it. H.R. Rep. No. 22-488, at 1 (1832). The Secretary conferred with Jackson, who refused to comply with the committee's request on the same ground cited by President Washington: he "d[id] not perceive that a copy of any part of the incomplete and unratified treaty of 1830, c[ould] be 'relative to any purpose under the cognizance of the House of Representatives, except that of an impeachment, which the resolution has not expressed.'" *Id.* at 14 (reprinting Letter for Charles A. Wickliffe, Chairman, Committee on Public Lands, U.S. House of Representatives, from Lewis Cass, Secretary of War (Mar. 2, 1832)).

In 1846, another House select committee requested that President Polk account for diplomatic expenditures made in previous administrations by Secretary of State Daniel Webster. Polk refused to disclose information but "cheerfully admitted" that the House may have been entitled to such information if it had "institute[d] an [impeachment] inquiry into the matter." Cong. Globe, 29th Cong., 1st Sess. 698 (1846).[13] Notably, he

---

[13] In denying the congressional request before him, President Polk suggested, in the equivalent of dictum, that, during an impeachment inquiry, "all the archives and papers of the Executive departments, public or private, would be subject to the inspection and control of a committee of their body." Cong. Globe, 29th Cong., 1st Sess. 698 (1846). That statement, however, dramatically understates the degree to which executive privilege remains available during an impeachment investigation to protect confidentiality interests necessary to preserve the essential functions of the Executive Branch. *See Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __, at *3 & n.1 (Nov. 1, 2019). In a prior opinion, this Office viewed Polk as acknowledging the continued availability of executive privilege, because we read Polk's preceding sentence as "indicat[ing]" that, even in the impeachment context, "the Executive branch 'would adopt all wise precautions to prevent the exposure of all such matters the publication of which might injuriously affect the public interest, except so far as

took this position even though some members of Congress had suggested that evidence about the expenditures could support an impeachment of Webster.[14] In these and other instances, the Executive Branch has consistently drawn a distinction between the power of legislative oversight and the power of impeachment. *See Mazars USA*, 940 F.3d at 761–64 (Rao, J., dissenting) (discussing examples from the Buchanan, Grant, Cleveland, Theodore Roosevelt, and Coolidge Administrations).

### 3.

House members, too, have consistently recognized the difference between a legislative oversight investigation and an impeachment investigation. *See* Alissa M. Dolan et al., Cong. Research Serv., RL30240, *Congressional Oversight Manual* 25 (Dec. 19, 2014) ("A committee's inquiry must have a legislative purpose *or* be conducted pursuant to *some other constitutional power* of Congress, such as the authority . . . to . . . conduct impeachment proceedings." (emphases added)); Cong. Research Serv., *Congressional Access to Information in an Impeachment Investigation* at 1 (distinguishing between "*legislative* investigation[s]" and "[m]uch more rare[]" "*impeachment* investigation[s]").

For instance, in 1793, when debating the House's jurisdiction to investigate Secretary of the Treasury Alexander Hamilton, some members argued that the House could not adopt a resolution of investigation into Hamilton's conduct without adopting the "solemnities and guards" of an impeachment inquiry. *See, e.g.*, 3 Annals of Cong. 903 (1793) (statement of Rep. Smith); *id.* at 947–48 (statement of Rep. Boudinot) (distinguishing between the House's "Legislative capacity" and its role as "the grand inquest of the Nation"); *see also Mazars USA*, 940 F.3d at 758 (Rao, J., dissenting) (discussing the episode). In 1796, when the House debated

---

this might be necessary to accomplish the great ends of public justice.'" Memorandum for Elliot Richardson, Attorney General, from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Re: Presidential Immunity from Coercive Congressional Demands for Information* at 22–23 (July 24, 1973) (quoting Polk's letter).

[14] *See, e.g.*, Cong. Globe, 29th Cong., 1st Sess. 636 (1846) (statement of Rep. Ingersoll) ("Whether . . . [Webster's] offences will be deemed impeachable misdemeanors in office, conviction for which might remove him from the Senate, and disqualify him to hold any office of honor, trust, or profit, under the United States, will remain to be considered."); Todd Garvey, *The Webster and Ingersoll Investigations*, *in* Morton Rosenberg, The Constitution Project, *When Congress Comes Calling* 289 (2017).

whether to request the President's instructions for negotiating the Jay Treaty, Representative Murray concluded that the House could not meddle in treatymaking, but acknowledged that "the subject would be presented under an aspect very different" if the resolution's supporters had "stated the object for which they called for the papers to be an impeachment." 5 Annals of Cong. 429–30 (1796).

Similarly, in 1846, a House select committee agreed with President Polk's decision not to turn over requested information regarding State Department expenditures where the House did not act "with a view to an impeachment." H.R. Rep. No. 29-684, at 4 (1846) (noting that four of the committee's five members "entirely concur with the President of the United States" in deciding not to "communicate or make [the requested documents] public, except with a view to an impeachment" and that "[n]o dissent from the views of that message was expressed by the House"); *see also Mazars USA*, 940 F.3d at 761 (Rao, J., dissenting). To take another example, in 1879, the House Judiciary Committee distinguished "[i]nvestigations looking to the impeachment of public officers" from "an ordinary investigation for legislative purposes." H.R. Rep. No. 45-141, at 2 (1879).

Most significantly, during the impeachments of Presidents Nixon and Clinton, the House Judiciary Committee determined that the House must provide express authorization before any committee may exercise compulsory powers in an impeachment investigation. *See infra* Part II.C.1. Thus, members of the House, like the other branches of government, have squarely recognized the distinction between congressional investigations for impeachment purposes and those for legislative purposes.

### B.

Although the House of Representatives has "the *sole* Power of Impeachment," U.S. Const. art. I, § 2, cl. 5 (emphasis added), the associated power to conduct an investigation for impeachment purposes may, like the House's other investigative powers, be delegated. The full House may make such a delegation by adopting a resolution in exercise of its authority to determine the rules for its proceedings, *see id*. art. I, § 5, cl. 2, and each House has broad discretion in determining the conduct of its own proceedings. *See, e.g.*, *NLRB v. Noel Canning*, 573 U.S. 513, 551–52 (2014); *United States v. Ballin*, 144 U.S. 1, 5 (1892); *see also* 1 *Deschler's Precedents* ch. 5, § 4, at 305–06. But the House must actually exer-

cise its discretion by making that judgment in the first instance, and its resolution sets the terms of a committee's authority. *See United States v. Rumely*, 345 U.S. 41, 44 (1953). No committee may exercise the House's investigative powers in the absence of such a delegation.

As the Supreme Court has explained in the context of legislative oversight, "[t]he theory of a committee inquiry is that the committee members are serving as the representatives of the parent assembly in collecting information for a legislative purpose" and, in such circumstances, committees "are endowed with the full power of the Congress to compel testimony." *Watkins*, 354 U.S. at 200–01. The same is true for impeachment investigations.[15] Thus, Hamilton recognized, the impeachment power involves a trust of such "delicacy and magnitude" that it "deeply concerns the political reputation and existence of every man engaged in the administration of public affairs." *The Federalist* No. 65, at 440. The Founders foresaw that an impeachment effort would "[i]n many cases . . . connect itself with the pre-existing factions" and "inlist all their animosities, partialities, influence and interest on one side, or on the other." *Id.* at 439. As a result, they placed the solemn authority to initiate an impeachment in "the representatives of the nation themselves." *Id.* at 440. In order to entrust one of its committees to investigate for purposes of impeachment, the full House must "spell out that group's jurisdiction and purpose." *Watkins*, 354 U.S. at 201. Otherwise, a House committee con-

---

[15] When the House first considered impeachment in 1796, Attorney General Charles Lee advised that, "before an impeachment is sent to the Senate, witnesses must be examined, in solemn form, respecting the charges, before a committee of the House of Representatives, to be appointed for that purpose." Letter for the House of Representatives from Charles Lee, Attorney General, *Re: Inquiry into the Official Conduct of a Judge of the Supreme Court of the Northwestern Territory* (May 9, 1796), *reprinted in* 1 Am. State Papers: Misc. 151 (Walter Lowrie & Walter S. Franklin eds., 1834). Because the charges of misconduct concerned the actions of George Turner, a territorial judge, and the witnesses were located in far-away St. Clair County (modern-day Illinois), Lee suggested that the "most solemn" mode of prosecution, an impeachment trial before the Senate, would be "very inconvenient, if not entirely impracticable." *Id.* Lee informed the House that President Washington had directed the territorial governor to arrange for a criminal prosecution before the territorial court. *See id.* The House committee considering the petition about Turner agreed with Lee's suggestion and recommended that the House take no further action. *See Inquiry into the Official Conduct of a Judge of the Supreme Court of the Northwestern Territory* (Feb. 27, 1797), *reprinted in* 1 Am. State Papers: Misc. at 157.

trolled by such a faction could launch open-ended and untethered investigations without the sanction of a majority of the House.

Because a committee may exercise the House's investigative powers only when authorized, the committee's actions must be within the scope of a resolution delegating authority from the House to the committee. As the D.C. Circuit recently explained, "it matters not whether the Constitution would give Congress authority to issue a subpoena if Congress has given the issuing committee no such authority." *Mazars USA*, 940 F.3d at 722; *see* Dolan, *Congressional Oversight Manual* at 24 ("Committees of Congress only have the power to inquire into matters within the scope of the authority delegated to them by their parent body."). In evaluating a committee's authority, the House's resolution "is the controlling charter of the committee's powers," and, therefore, the committee's "right to exact testimony and to call for the production of documents must be found in this language." *Rumely*, 345 U.S. at 44; *see also Watkins*, 354 U.S. at 201 ("Those instructions are embodied in the authorizing resolution. That document is the committee's charter."); *id*. at 206 ("Plainly [the House's] committees are restricted to the missions delegated to them . . . . No witness can be compelled to make disclosures on matters outside that area."); *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978) ("To issue a valid subpoena, . . . a committee or subcommittee must conform strictly to the resolution establishing its investigatory powers[.]"); *United States v. Lamont*, 18 F.R.D. 27, 32 (S.D.N.Y. 1955) (Weinfeld, J.) ("No committee of either the House or Senate, and no Senator and no Representative, is free on its or his own to conduct investigations unless authorized. Thus it must appear that Congress empowered the Committee to act, and further that at the time the witness allegedly defied its authority the Committee was acting within the power granted to it."). While a committee may study some matters without exercising the investigative powers of the House, a committee's authority to compel the production of documents and testimony depends entirely upon the jurisdiction provided by the terms of the House's delegation.

In *Watkins*, the Supreme Court relied upon those principles to set aside a conviction for contempt of Congress because of the authorizing resolution's vagueness. The uncertain scope of the House's delegation impermissibly created "a wide gulf between the responsibility for the use of investigative power and the actual exercise of that power." 354 U.S. at 205. If the House wished to authorize the exercise of its investigative power, then it needed to take responsibility for the use of that power,

because a congressional subpoena, issued with the threat of a criminal contempt citation, necessarily placed "constitutional liberties" in "danger." *Id.*

The concerns expressed by the Court in *Watkins* apply with equal, if not greater, force when considering the authority of a House committee to compel the production of documents in connection with investigating impeachment. As John Labovitz, a House impeachment attorney during the Nixon investigation, explained: "[I]mpeachment investigations, because they involve extraordinary power and (at least where the president is being investigated) may have extraordinary consequences, are not to be undertaken in the same manner as run-of-the-mill legislative investigations. The initiation of a presidential impeachment inquiry should itself require a deliberate decision by the House." John R. Labovitz, *Presidential Impeachment* 184 (1978). Because a committee possesses only the authorities that have been delegated to it, a committee may not use compulsory process to investigate impeachment without the formal authorization of the House.

## C.

Historical practice confirms that the House must authorize an impeachment inquiry. *See, e.g.*, *Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2091 (2015) (recognizing that "[i]n separation-of-powers cases," the Court has placed "significant weight" on "accepted understandings and practice"); *Noel Canning*, 573 U.S. at 514 (same). The House has expressly authorized every impeachment investigation of a President, including by identifying the investigative committee and authorizing the use of compulsory process. The same thing has been true for nearly all impeachment investigations of other executive officials and judges. While committees have sometimes studied a proposed impeachment resolution or reviewed available information without conducting a formal investigation, in nearly every case in which the committee resorted to compulsory process, the House expressly authorized the impeachment investigation. That practice was foreseen as early as 1796. When Washington asked his Cabinet for opinions about how to respond to the House's request for the papers associated with the Jay Treaty, the Secretary of the Treasury, Oliver Wolcott Jr., explained that "the House of Representatives has no right to demand papers" outside its legislative function "[e]xcept when an Impeachment is proposed *& a formal enquiry instituted*." Letter for George

Washington from Oliver Wolcott Jr. (Mar. 26, 1796), *reprinted in* 19 *The Papers of George Washington: Presidential Series* 611–12 (David R. Hoth ed., 2016) (emphasis added).

From the very first impeachment, the House has recognized that a committee would require a delegation to conduct an impeachment inquiry. In 1797, when House members considered whether a letter contained evidence of criminal misconduct by Senator William Blount, they sought to confirm Blount's handwriting but concluded that the Committee of the Whole did not have the power of taking evidence. *See* 7 Annals of Cong. 456–58 (1797); 3 Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States* § 2294, at 644–45 (1907). Thus, the committee "rose," and the House itself took testimony. 3 *Hinds' Precedents* § 2294, at 646. Two days later, the House appointed a select committee to "prepare and report articles of impeachment" and vested in that committee the "power to send for persons, papers, and records." 7 Annals of Cong. at 463–64, 466; 3 *Hinds' Precedents* § 2297, at 648.[16] As we discuss in this section, we have identified dozens of other instances where the House, in addition to referring proposed articles of impeachment, authorized formal impeachment investigations.

Against this weighty historical record, which involves nearly 100 authorized impeachment investigations, the outliers are few and far between.[17] In 1879, it appears that a House committee, which was expressly authorized to conduct an oversight investigation into the administration of the U.S. consulate in Shanghai, ultimately investigated and recommended that the former consul-general and former vice consul-general be impeached. In addition, between 1986 and 1989, the Judiciary Committee considered the impeachment of three federal judges who had been criminally prosecuted (two of whom had been convicted). The Judiciary Committee pursued impeachment before there had been any House vote, and issued subpoenas in two of those inquiries. Since then, however, the Judiciary Committee reaffirmed during the impeachment of President

---

[16] After the House impeached Senator Blount, the Senate voted to dismiss the charges on the ground that a Senator is not a civil officer subject to impeachment. *See* 3 *Hinds' Precedents* § 2318, at 678–80.

[17] A 2007 overview concluded that "[t]here have been approximately 94 identifiable impeachment-related inquiries conducted by Congress[.]" H.R. Doc. No. 109-153, at 115 (2007). Since 2007, two more judges have been impeached following authorized investigations.

Clinton that, in order to conduct an impeachment investigation, it needed an express delegation of investigative authority from the House. And in all subsequent cases the House has hewed to the well-established practice of authorizing each impeachment investigation.

The U.S. District Court for the District of Columbia recently reviewed a handful of historical examples and concluded that House committees may conduct impeachment investigations without a vote of the full House. *See In re Application of the Comm. on the Judiciary*, 2019 WL 5485221, at *26–28. Yet, as the discussion below confirms, the district court misread the lessons of history.[18] The district court treated the House Judiciary Committee's preliminary inquiries in the Clinton and Nixon impeachments as investigations, without recognizing that, in both cases, the committee determined that a full House vote was necessary before it could issue subpoenas. The district court also treated the 1980s judicial inquiries as if they represented a rule of practice, rather than a marked deviation from the dozens of occasions where the House recognized the need to adopt a formal resolution to delegate its investigative authority. As our survey below confirms, the historical practice with respect to Presidents, other executive officers, and judges is consistent with the structure of our Constitution, which requires the House, as the "sole" holder of impeachment power, to authorize any impeachment investigation that a committee may conduct on its behalf.

---

[18] The district court's erroneous conclusions rested upon the arguments offered by the House Judiciary Committee, which relied principally upon the judicial outliers from the 1980s, a misunderstanding of the Nixon impeachment inquiry, and a misreading of the committee's subpoena power under the House Rules. *See* Application at 33–34, *In re Application of the Comm. on the Judiciary* (D.D.C. July 26, 2019); Reply of the Committee on the Judiciary, U.S. House of Representatives, in Support of Its Application for an Order Authorizing the Release of Certain Grand Jury Materials, at 16 n.19, *In re Application of the Comm. on the Judiciary* (D.D.C. Sept. 30, 2019). HPSCI and the Judiciary Committee later reiterated these arguments in their reports, each contending that executive branch officials had "obstructed" the House's impeachment inquiry by declining to comply with the pre-October 31 impeachment-related subpoenas. H.R. Rep. No. 116-335, at 168–72, 175–77 (2019); H.R. Rep. No. 116-346, at 10, 13–16 (2019). But those reports asserted that the pre-October 31 subpoenas were authorized because the committees misunderstood the historical practice concerning the House's impeachment inquiries (as we discuss in Part II.C) and they misread the committees' subpoena authority under the House Rules (as we discuss in Part III.A).

### 1.

While many Presidents have been the subject of less-formal demands for impeachment, at least eleven have faced resolutions introduced in the House for the purpose of initiating impeachment proceedings.[19] In some cases, the House formally voted to reject opening a presidential impeachment investigation. In 1843, the House rejected a resolution calling for an investigation into the impeachment of President Tyler. *See* Cong. Globe, 27th Cong., 3d Sess. 144–46 (1843). In 1932, the House voted by a wide margin to table a similar resolution introduced against President Hoover. *See* 76 Cong. Rec. 399–402 (1932). In many other cases, the House simply referred impeachment resolutions to the Judiciary Committee, which took no further action before the end of the Congress. But, in three instances before President Trump, the House moved forward with investigating the impeachment of a President.[20] Each of those presidential impeachments advanced to the investigative stage only after the House

---

[19] *See, e.g.*, Cong. Globe, 27th Cong., 3d Sess. 144, 146 (1843) (John Tyler); Cong. Globe, 39th Cong., 2d Sess. 320 (1867) (Andrew Johnson); 28 Cong. Rec. 5627, 5650 (1896) (Grover Cleveland); 76 Cong. Rec. 399–402 (1932) (Herbert Hoover); H.R. Res. 607, 82d Cong. (1952) (Harry Truman); H.R. Res. 625, 93d Cong. (1973) (Richard Nixon); H.R. Res. 370, 98th Cong. (1983) (Ronald Reagan); H.R. Res. 34, 102d Cong. (1991) (George H.W. Bush); H.R. Res. 525, 105th Cong. (1998) (Bill Clinton); H.R. Res. 1258, 110th Cong. (2008) (George W. Bush); H.R. Res. 13, 106th Cong. (2019) (Donald Trump).

[20] In 1860, the House authorized an investigation into the actions of President Buchanan, but that investigation was not styled as an impeachment investigation. *See* Cong. Globe, 36th Cong., 1st Sess. 997–98 (1860) (resolution establishing a committee of five members to "investigat[e] whether the President of the United States, or any other officer of the government, ha[d], by money, patronage, or other improper means, sought to influence the action of Congress" or "by combination or otherwise, . . . attempted to prevent or defeat, the execution of any law"). It appears to have been understood by the committee as an oversight investigation. *See* H.R. Rep. No. 36-648, at 1–28 (1860). Buchanan in fact objected to the House's use of its legislative jurisdiction to circumvent the protections traditionally provided in connection with impeachment. *See* Message for the U.S. House of Representatives from James Buchanan (June 22, 1860), *reprinted in* 5 *A Compilation of the Messages and Papers of the Presidents* 625 (James D. Richardson ed., 1897) (objecting that if the House suspects presidential misconduct, it should "transfer the question from [its] legislative to [its] accusatory jurisdiction, and take care that in all the preliminary judicial proceedings preparatory to the vote of articles of impeachment the accused should enjoy the benefit of cross-examining the witnesses and all the other safeguards with which the Constitution surrounds every American citizen"); *see also Mazars USA*, 940 F.3d at 762 (Rao, J., dissenting) (discussing the episode).

adopted a resolution expressly authorizing a committee to conduct the investigation. In no case did the committee use compulsory process until the House had expressly authorized the impeachment investigation.

***The impeachment investigation of President Andrew Johnson.*** On January 7, 1867, the House adopted a resolution authorizing the "Committee on the Judiciary" to "inquire into the official conduct of Andrew Johnson . . . and to report to this House whether, in their opinion," the President "has been guilty of any act, or has conspired with others to do acts, which, in contemplation of the Constitution, are high crimes or misdemeanors." Cong. Globe, 39th Cong., 2d Sess. 320–21 (1867); *see also* 3 *Hinds' Precedents* § 2400, at 824. The resolution conferred upon the committee the "power to send for persons and papers and to administer the customary oath to witnesses." Cong. Globe, 39th Cong., 2d Sess. 320 (1867). The House referred a second resolution to the Judiciary Committee on February 4, 1867. *Id.* at 991; 3 *Hinds' Precedents* § 2400, at 824.[21] Shortly before that Congress expired, the committee reported that it had seen "sufficient testimony . . . to justify and demand a further prosecution of the investigation." H.R. Rep. No. 39-31, at 2 (1867). On March 7, 1867, the House in the new Congress adopted a resolution that authorized the committee "to continue the investigation authorized" in the January 7 resolution and to "send for persons and papers" and administer oaths. Cong. Globe, 40th Cong., 1st Sess. 18, 25 (1867); 3 *Hinds' Precedents* § 2401, at 825–26. The committee recommended articles of impeachment, but the House rejected those articles on December 7, 1867. *See* Cong. Globe, 40th Cong., 2d Sess. 67–68 (1867). In early 1868, however, the House adopted resolutions authorizing another investigation, with compulsory powers, by the Committee on Reconstruction and transferred to that committee the evidence from the Judiciary Committee's

---

[21] The district court's recent decision in *In re Application of the Committee on the Judiciary* misreads *Hinds' Precedents* to suggest that the House Judiciary Committee (which the court called "HJC") began investigating President Johnson's impeachment without any authorizing resolution. According to the district court, "a resolution 'authoriz[ing]' HJC 'to inquire into the official conduct of Andrew Johnson' was passed *after* HJC 'was already considering the subject.'" 2019 WL 5485221, at *27 (quoting 3 *Hinds' Precedents* § 2400, at 824). In fact, the committee was "already considering the subject" at the time of the February 4 resolution described in the quoted sentence because, as explained in the text above, the House had previously adopted a separate resolution authorizing an impeachment investigation. *See* Cong. Globe, 39th Cong., 2d Sess. 320–21 (1867); 3 *Hinds' Precedents* § 2400, at 824.

earlier investigation. *See* Cong. Globe, 40th Cong., 2d Sess. 784–85, 1087 (1868); 3 *Hinds' Precedents* § 2408, at 845.

On February 21, 1868, the impeachment effort received new impetus when Johnson removed the Secretary of War without the Senate's approval, contrary to the terms of the Tenure of Office Act, which Johnson (correctly) held to be an unconstitutional limit on his authority. *See* Cong. Globe, 40th Cong., 2d Sess. 1326–27 (1868); 3 *Hinds' Precedents* § 2408–09, at 845–47; *see also Myers v. United States*, 272 U.S. 52, 176 (1926) (finding that provision of the Tenure of Office Act "was invalid"). That day, the Committee on Reconstruction reported an impeachment resolution to the House, which was debated on February 22 and passed on February 24. Cong. Globe, 40th Cong., 2d Sess. 1400 (1868); 3 *Hinds' Precedents* §§ 2409–12, at 846–51.

***The impeachment investigation of President Nixon.*** Although many resolutions were introduced in support of President Nixon's impeachment earlier in 1973, the House's formal impeachment inquiry arose in the months following the "Saturday Night Massacre," during which President Nixon caused the termination of Special Prosecutor Archibald Cox at the cost of the resignations of his Attorney General and Deputy Attorney General. *See* Letter Directing the Acting Attorney General to Discharge the Director of the Office of Watergate Special Prosecution Force (Oct. 20, 1973), *Pub. Papers of Pres. Richard Nixon* 891 (1973). Immediately thereafter, House members introduced resolutions calling either for the President's impeachment or for the opening of an investigation.[22] The Speaker of the House referred the resolutions calling for an investigation to the Rules Committee and those calling for impeachment to the Judiciary Committee. *See* Office of Legal Counsel, U.S. Dep't of Justice, *Legal Aspects of Impeachment: An Overview* at 40 (Feb. 1974) ("*Legal Aspects of Impeachment*"); 3 *Deschler's Precedents* ch. 14, § 5, at 2020.

Following the referrals, the Judiciary Committee "beg[a]n an inquiry into whether President Nixon ha[d] committed any offenses that could lead to impeachment," an exercise that the committee considered "preliminary." Richard L. Madden, *Democrats Agree on House Inquiry into Nixon's Acts*, N.Y. Times, Oct. 23, 1973, at 1. The committee started collecting publicly available materials, and Chairman Peter Rodino Jr. stated that he

---

[22] *See, e.g.*, H.R. Res. 625, 631, 635, and 638, 93d Cong. (1973) (impeachment); H.R. Res. 626, 627, 628, 636, and 637, 93d Cong. (1973) (Judiciary Committee or subcommittee investigation).

would "set up a separate committee staff to 'collate' investigative files from Senate and House committees that have examined a variety of charges against the Nixon Administration." James M. Naughton, *Rodino Vows Fair Impeachment Inquiry*, N.Y. Times, Oct. 30, 1973, at 32.

Although the committee "adopted a resolution permitting Mr. Rodino to issue subpoenas without the consent of the full committee," James M. Naughton, *House Panel Starts Inquiry on Impeachment Question,* N.Y. Times, Oct. 31, 1973, at 1, no subpoenas were ever issued under that purported authority. Instead, the committee "delayed acting" on the impeachment resolutions. James M. Naughton, *House Unit Looks to Impeachment*, N.Y. Times, Dec. 2, 1973, at 54. By late December, the committee had hired a specialized impeachment staff. *A Hard-Working Legal Adviser: John Michael Doar*, N.Y. Times, Dec. 21, 1973, at 20. The staff continued "'wading through the mass of material already made public,'" and the committee's members began considering "the areas in which the inquiry should go." Bill Kovach, *Vote on Subpoena Could Test House on Impeachment*, N.Y. Times, Jan. 8, 1974, at 14; *see also* Staff of the H. Comm. on the Judiciary, 93d Cong., Rep. on Work of the Impeachment Inquiry Staff as of February 5, 1974, at 2–3 (1974) (noting that the staff was "first collecting and sifting the evidence available in the public domain," then "marshaling and digesting the evidence available through various governmental investigations"). By January 1974, the committee's actions had consisted of digesting publicly available documents and prior impeachment precedents. That was consistent with the committee's "only mandate," which was to "study more than a dozen impeachment resolutions submitted" in 1973. James M. Naughton, *Impeachment Panel Seeks House Mandate for Inquiry*, N.Y. Times, Jan. 25, 1974, at 1.

In January, the committee determined that a formal investigation was necessary, and it requested "an official House mandate to conduct the inquiry," relying upon the "precedent in each of the earlier [impeachment] inquiries." *Id*. at 17. On January 7, Chairman Rodino "announced that the Committee's subpoena power does not extend to impeachment and that . . . the Committee would seek express authorization to subpoena persons and documents with regard to the impeachment inquiry." *Legal Aspects of Impeachment* at 43; *see also* Richard L. Lyons, *GOP Picks Jenner as Counsel*, Wash. Post, Jan. 8, 1974, at A1, A6 ("Rodino said the committee will ask the House when it reconvenes Jan. 21 to give it power to subpoena persons and documents for the inquiry. The committee's subpoena power does not now extend to impeachment proceedings, he said."). As

the House Parliamentarian later explained, the Judiciary Committee's general authority to conduct investigations and issue subpoenas "did not specifically include impeachments within the jurisdiction of the Committee on the Judiciary," and it was therefore "considered necessary for the House to specifically vest the Committee on the Judiciary with the investigatory and subpena power to conduct the impeachment investigation." 3 *Deschler's Precedents* ch. 14, § 15.2, at 2172 (Parliamentarian's Note).

On February 6, 1974, the House approved Resolution 803, which "authorized and directed" the Judiciary Committee "to investigate fully and completely whether sufficient grounds exist for the House of Representatives to exercise its constitutional power to impeach Richard M. Nixon, President of the United States of America." H.R. Res. 803, 93d Cong. § 1. The resolution specifically authorized the committee "to require . . . by subpena or otherwise . . . the attendance and testimony of any person" and "the production of such things" as the committee "deem[ed] necessary" to its investigation. *Id*. § 2(a).

Speaking on the House floor, Chairman Rodino described the resolution as a "necessary step" to confer the House's investigative powers on the Judiciary Committee:

> We have reached the point when it is important that the House explicitly confirm our responsibility under the Constitution.
>
> We are asking the House of Representatives, by this resolution, to authorize and direct the Committee on the Judiciary to investigate the conduct of the President of the United States . . . .
>
> As part of that resolution, we are asking the House to give the Judiciary Committee the power of subpena in its investigations.
>
> *Such a resolution has always been passed by the House. . . . It is a necessary step if we are to meet our obligations.*
>
> . . . .
>
> . . . The sole power of impeachment carries with it the power to conduct a full and complete investigation of whether sufficient grounds for impeachment exist or do not exist, and *by this resolution these investigative powers are conferred to their full extent upon the Committee on the Judiciary*.

120 Cong. Rec. 2350–51 (1974) (emphases added). During the debate, others recognized that the resolution would delegate the House's investigative powers to the Judiciary Committee. *See, e.g.*, *id.* at 2361 (statement

of Rep. Rostenkowski) ("By delegating to the Judiciary Committee the powers contained in this resolution, we will be providing that committee with the resources it needs to inform the whole House of the facts of this case."); *id.* at 2362 (statement of Rep. Boland) ("House Resolution 803 is intended to delegate to the Committee on the Judiciary the full extent of the powers of this House in an impeachment proceeding[]—both as to the persons and types of things that may be subpenaed and the methods for doing so."). Only after the Judiciary Committee had received authorization from the House did it request and subpoena tape recordings and documents from President Nixon. *See* H.R. Rep. No. 93-1305, at 187 (1974).[23]

**The impeachment investigation of President Clinton.** On September 9, 1998, Independent Counsel Kenneth W. Starr, acting under 28 U.S.C. § 595(c), advised the House of Representatives that he had uncovered substantial and credible information that he believed could constitute grounds for the impeachment of President Clinton. 18 *Deschler's Precedents* app. at 548–49 (2013). Two days later, the House adopted a resolution that referred the matter, along with Starr's report and 36 boxes of evidence, to the Judiciary Committee. H.R. Res. 525, 105th Cong. (1998). The House directed that committee to review the report and "determine whether sufficient grounds exist to recommend to the House that an impeachment inquiry be commenced." *Id*. § 1. The Rules Committee's Chairman emphasized that the House would need to adopt a subsequent resolution if it decided to authorize an impeachment inquiry: "[T]his resolution does not authorize or direct an impeachment inquiry. . . . It merely provides the appropriate parameters for the Committee on the Judiciary . . . to . . . make a recommendation to the House as to whether we should commence an impeachment inquiry." 144 Cong. Rec. 20021 (1998) (statement of Rep. Solomon).

---

[23] A *New York Times* article the following day characterized House Resolution 803 as "formally ratif[ying] the impeachment inquiry begun by the committee [the prior] October." James M. Naughton, *House, 410-4, Gives Subpoena Power in Nixon Inquiry*, N.Y. Times, Feb. 7, 1974, at 1. But the resolution did not grant after-the-fact authorization for any prior action. To the contrary, the resolution "authorized and directed" a future investigation, including by providing subpoena power. In the report recommending adoption of the resolution, the committee likewise described its plans in the future tense: "It is the intention of the committee that its investigation will be conducted in all respects on a fair, impartial and bipartisan basis." H.R. Rep. No. 93-774, at 3 (1974).

On October 7, 1998, the Judiciary Committee did recommend that there be an investigation for purposes of impeachment. As explained in the accompanying report: "[T]he Committee decided that *it must receive authorization from the full House before proceeding* on any further course of action. Because impeachment is delegated solely to the House of Representatives by the Constitution, the full House of Representatives should be involved in critical decision making regarding various stages of impeachment." H.R. Rep. No. 105-795, at 24 (emphasis added). The committee also observed that "a resolution authorizing an impeachment inquiry into the conduct of a president is consistent with past practice," citing the resolutions for Presidents Johnson and Nixon and observing that "numerous other inquiries were authorized by the House directly, or by providing investigative authorities, such as deposition authority, to the Committee on the Judiciary." *Id*.

The next day, the House voted to authorize the Judiciary Committee to "investigate fully and completely whether sufficient grounds exist for the House of Representatives to exercise its constitutional power to impeach William Jefferson Clinton, President of the United States of America." H.R. Res. 581, 105th Cong. § 1 (1998). The resolution authorized the committee "to require . . . by subpoena or otherwise . . . the attendance and testimony of any person" and "the production of . . . things," and to require the furnishing of information "by interrogatory." *Id*. § 2(a). "On November 5, 1998," as part of its investigation, "the Committee presented President Clinton with 81 requests for admission," which the Committee explained that it "would have . . . compelled by subpoena" had President Clinton not complied. H.R. Rep. No. 105-830, at 77, 122 (1998). And the Committee then "approved the issuance of subpoenas for depositions and materials" from several witnesses. 144 Cong. Rec. D1210–11 (daily ed. Dec. 17, 1998).

In discussing the Clinton precedent, the district court in *In re Application of the Committee on the Judiciary* treated the D.C. Circuit's approval of the disclosure of Starr's report and associated grand-jury information as evidence that the Judiciary Committee may "commence an impeachment investigation" without a House vote. 2019 WL 5485221, at *27 & n.36. But the D.C. Circuit did not authorize that disclosure because of any pending House investigation. It did so because a statutory provision required an independent counsel to "advise the House of Representatives of any substantial and credible information which such independent counsel receives . . . *that may constitute grounds for an impeachment*."

28 U.S.C. § 595(c) (emphasis added). And the D.C. Circuit viewed the report as reflecting "information of the type described in 28 U.S.C. § 595(c)." *In re Madison Guar. Sav. & Loan Ass'n*, Div. No. 94-1 (D.C. Cir. Spec. Div. July 7, 1998), *reprinted in* H.R. Doc. No. 105-331, pt. 1, at 10 (1998). The order authorizing the transmission of that information *to the House* did not imply that any committee was conducting an impeachment investigation. To the contrary, after the House received the information, "no person had access to" it until after the House adopted a resolution referring the matter to the Judiciary Committee. H.R. Rep. No. 105-795, at 5. And the House then adopted a second resolution (Resolution 581) to authorize a formal investigation. In other words, the House voted to authorize the Judiciary Committee both to review the Starr evidence and to conduct an impeachment investigation. Neither the D.C. Circuit nor the Judiciary Committee suggested that any committee could have taken such action on its own.

## 2.

The House has historically followed these same procedures in considering impeachment resolutions against executive branch officers other than the President. In many cases, an initial resolution laying out charges of impeachment or authorizing an investigation was referred to a select or standing committee.[24] Following such a referral, the designated committee

---

[24] As with Presidents, many of these resolutions remained with the committees until they expired at the end of the Congress. Several merely articulated allegations of impeachment. *See, e.g.*, H.R. Res. 1028, 115th Cong. (2018) (Deputy Attorney General Rod Rosenstein); H.R. Res. 417, 114th Cong. (2015) (Administrator of the Environmental Protection Agency Regina McCarthy); H.R. Res. 411, 113th Cong. (2013) (Attorney General Eric Holder); H.R. Res. 333, 110th Cong. (2007) (Vice President Richard Cheney); H.R. Res. 629, 108th Cong. (2004) (Secretary of Defense Donald Rumsfeld); H.R. Res. 805, 95th Cong. (1977) (United Nations Ambassador Andrew Young); H.R. Res. 274, 95th Cong. (1977) (Commissioner of the Federal Trade Commission Paul Dixon); H.R. Res. 881, 94th Cong. (1975) (U.S. Attorney Jonathan Goldstein and Principal Assistant U.S. Attorney Bruce Goldstein); H.R. Res. 647, 94th Cong. (1975) (Ambassador to Iran Richard Helms); H.R. Res. 547, 94th Cong. (1975) (Special Crime Strike Force Prosecutor Liam Coonan). Others called for an investigation. *See, e.g.*, H.R. Res. 589, 110th Cong. (2007) (Attorney General Alberto Gonzales); H.R. Res. 582, 105th Cong. (1998) (Independent Counsel Kenneth Starr); H.R. Res. 102, 99th Cong. (1985) (Chairman of the Board of Governors of the Federal Reserve System Paul Volcker); H.R. Res. 101, 99th Cong. (1985) (same and others); H.R. Res. 1025, 95th Cong. (1978) (Attorney General Griffin Bell); H.R. Res. 1002, 95th Cong. (1978) (same); H.R. Res. 569, 93d

reviewed the matter and considered whether to pursue a formal impeachment inquiry—it did not treat the referral as stand-alone authorization to conduct an investigation. When a committee concluded that the charges warranted investigation, it reported to the full House, which then considered whether to adopt a resolution to authorize a formal investigation.

For example, in March 1867, the House approved a resolution directing the Committee on Public Expenditures "to inquire into the conduct of Henry A. Smythe, collector of the port of New York." Cong. Globe, 40th Cong., 1st Sess. 132 (1867); *see also id.* (noting that the resolution had been modified following debate "so as to leave out that part about bringing articles of impeachment"). Weeks later, the House voted to authorize an impeachment investigation. *Id.* at 290 (authorizing the investigating committee to "send for persons and papers"). The House followed this same procedure in 1916 for U.S. Attorney H. Snowden Marshall. H.R. Res. 90, 64th Cong. (1916) (initial resolution referred to the Judiciary Committee); H.R. Res. 110, 64th Cong. (1916) (resolution approving the investigation contemplated in the initial resolution). And the process repeated in 1922 for Attorney General Harry Daugherty. H.R. Res. 425, 67th Cong. (1922) (referring the initial resolution to the committee); H.R. Res. 461, 67th Cong. (1922) (resolution approving the investigation contemplated in the initial resolution).

In a few instances, the House asked committees to draft articles of impeachment without calling for any additional impeachment investigation. For example, in 1876, after uncovering "unquestioned evidence of the malfeasance in office by General William W. Belknap" (who was then Secretary of War) in the course of another investigation, the House approved a resolution charging the Committee on the Judiciary with the responsibility to "prepare and report without unnecessary delay suitable articles of impeachment." 4 Cong. Rec. 1426, 1433 (1876). When a key witness left the country, however, the committee determined that additional investigation was warranted, and it asked to be authorized "to take

---

Cong. (1973) (Vice President Spiro Agnew); H.R. Res. 67, 76th Cong. (1939) (Secretary of Labor Frances Perkins and others); 28 Cong. Rec. 114, 126 (1895) (Ambassador to Great Britain Thomas Bayard); 16 Cong. Rec. 17–19 (1884) (U.S. Marshal Lot Wright); Cong. Globe, 40th Cong., 1st Sess. 778–79 (1867) (Minister to Great Britain Charles Francis Adams). On occasion, the House voted to table these resolutions instead of referring them to a committee. *See, e.g.*, H.R. Res. 545, 105th Cong. (1998) (resolution of impeachment for Independent Counsel Kenneth Starr); H.R. Res. 1267, 95th Cong. (1978) (resolution of impeachment for Ambassador to the United Nations Andrew Young).

further proof" and "to send for persons and papers" in its search for alternative evidence. *Id.* at 1564, 1566; *see also* 3 *Hinds' Precedents* §§ 2444–45, at 902–04.

In some cases, the House declined to authorize a committee to investigate impeachment with the aid of compulsory process. In 1873, the House authorized the Judiciary Committee "to inquire whether anything" in testimony presented to a different committee implicating Vice President Schuyler Colfax "warrants articles of impeachment of any officer of the United States not a member of this House, or makes it proper that further investigation should be ordered in his case." Cong. Globe, 42d Cong., 3d Sess. 1545 (1873); *see* 3 *Hinds' Precedents* § 2510, at 1016–17. No further investigation was authorized. A similar sequence occurred in 1917 in the case of an impeachment resolution offered against members of the Federal Reserve Board. *See* 54 Cong. Rec. 3126–30 (1917) (impeachment resolution); H.R. Rep. No. 64-1628, at 1 (1917) (noting that following the referral of the impeachment resolution, the Committee had reviewed available information and determined that no further proceedings were warranted). In 1932, the House referred to the Judiciary Committee a resolution calling for the investigation of the possible impeachment of Secretary of the Treasury Andrew Mellon. H.R. Res. 92, 72d Cong. (1932); *see also* 3 *Deschler's Precedents* ch. 14, § 14.1, at 2134–39. The following month, the House approved a resolution discontinuing any investigation of the charges. 75 Cong. Rec. 3850 (1932); *see also* 3 *Deschler's Precedents* ch. 14, § 14.2, at 2139–40.

Most recently, in the 114th Congress, the House referred to the Judiciary Committee resolutions concerning the impeachment of the Commissioner of the Internal Revenue Service, John Koskinen. *See* H.R. Res. 494, 114th Cong. (2015); H.R. Res. 828, 114th Cong. (2016). Shortly after an attempt to force a floor vote on one of the resolutions, Koskinen voluntarily appeared before the committee at a hearing. *See Impeachment Articles Referred on John Koskinen (Part III): Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 2 (2016). The ranking minority member, Representative John Conyers, observed that, despite the title, "this is not an impeachment hearing" because, "[a]ccording to parliamentarians of the House past and present, the impeachment process does not begin until the House actually votes to authorize this Committee to investigate the charges." *Id.* at 3; *see also id.* at 30 (similar statement by Rep. Johnson). During the hearing, Commissioner Koskinen offered to provide a list of supporting witnesses who could be cross-examined "if

the Committee decided it wanted to go to a full-scale impeachment process, which I understand this is not." *Id.* at 45. Two months later, one of the impeachment resolutions was briefly addressed on the floor of the House, and again referred to the Judiciary Committee, but without providing any investigative authority. *See* 162 Cong. Rec. H7251–54 (daily ed. Dec. 6, 2016). The committee never sought to compel the appearance of Koskinen or any other witness, and the committee does not appear to have taken any further action before the Congress expired.

In his 1978 book on presidential impeachment, former House impeachment attorney John Labovitz observed that there were a "few exceptions," "mostly in the 1860s and 1870s," to the general rule that "past impeachment investigations ha[ve] been authorized by a specific resolution conferring subpoena power." Labovitz, *Presidential Impeachment* at 182 & n.18. In our review of the history, we have identified one case from that era where a House committee commenced a legislative oversight investigation and subsequently moved, without separate authorization, to consider impeachment.[25] But the overwhelming historical practice to the contrary confirms the Judiciary Committee's well-considered conclusions in 1974 and 1998 that a committee requires specific authorization from the House before it may use compulsory process to investigate for impeachment purposes.

---

[25] In 1878, the Committee on Expenditures in the State Department, which was charged with investigative authority for "the exposing of frauds or abuses of any kind," 7 Cong. Rec. 287, 290 (1878), was referred an investigation into maladministration at the consulate in Shanghai during the terms of Consul-General George Seward and Vice Consul-General O.B. Bradford, *id.* at 504, 769. Eventually, the committee began to consider Seward's impeachment, serving him with a subpoena for testimony and documents, in response to which he asserted his privilege against self-incrimination. *See* 3 *Hinds' Precedents* § 2514, at 1023–24; H.R. Rep. No. 45-141, at 1–3 (1879). The committee recommended articles of impeachment, but the House declined to act before the end of the Congress. *See* 8 Cong. Rec. 2350–55 (1879); 3 *Hinds' Precedents* § 2514, at 1025. During this same period, the Committee on Expenditures reported proposed articles of impeachment against Bradford but recommended "that the whole subject be referred to the Committee on the Judiciary" for further consideration. H.R. Rep. No. 45-818, at 7 (1878). The House agreed to the referral, but no further action was taken. 7 Cong. Rec. at 3667.

### 3.

The House has followed the same practice in connection with nearly all impeachment investigations involving federal judges. Committees sometimes studied initial referrals, but they waited for authorization from the full House before conducting any formal impeachment investigation. Three cases from the late 1980s departed from that pattern, but the House has returned during the past three decades to the historical baseline, repeatedly ensuring that the Judiciary Committee had a proper delegation for each impeachment investigation.

The practice of having the House authorize each specific impeachment inquiry is reflected in the earliest impeachment investigations involving judges. In 1804, the House considered proposals to impeach two judges: Samuel Chase, an associate justice of the Supreme Court, and Richard Peters, a district judge. *See* 3 *Hinds' Precedents* § 2342, at 711–16. There was a "lengthy debate" about whether the evidence was appropriate to warrant the institution of an inquiry. *Id*. at 712. The House then adopted a resolution appointing a select committee "to inquire into the official conduct" of Chase and Peters "and to report" the committee's "opinion whether" either of the judges had "so acted, in their judicial capacity, as to require the interposition of the constitutional power of this House." 13 Annals of Cong. 850, 875–76 (1804); 3 *Hinds' Precedents* § 2342, at 715. A few days later, another resolution "authorized" the committee "to send for persons, papers, and records." 13 Annals of Cong. at 877; *see also* 3 *Hinds' Precedents* § 2342, at 715. At the conclusion of its investigation, the committee recommended that Chase, but not Peters, be impeached. 3 *Hinds' Precedents* § 2343, at 716. The House thereafter agreed to a resolution impeaching Chase. *Id.* at 717. Congress recessed before the Senate could act, but, during the next Congress, the House appointed an almost identical select committee, which was "given no power of investigation." *Id.* §§ 2343–44, at 717–18. The committee recommended revised articles of impeachment against Chase, which were again adopted by the House. *Id.* § 2344, at 718–19. In 1808, the House again separately authorized an investigation when it considered whether Peter Bruin, a Mississippi territorial judge, should be impeached for "neglect of duty and drunkenness on the bench." *Id.* § 2487, at 983–84. A member of the House objected "that it would hardly be dignified for the Congress to proceed to an impeachment" based on the territorial legislature's referral and proposed the appointment of a committee "to inquire into the proprie-

ty of impeaching." *Id.* at 984; *see* 18 Annals of Cong. 2069 (1808). The House then passed a resolution forming a committee to conduct an inquiry, which included the "power to send for persons, papers, and records" but, like most inquiries to follow, did not result in impeachment. 18 Annals of Cong. at 2189; 3 *Hinds' Precedents* § 2487, at 984.

Over the course of more than two centuries thereafter, members of the House introduced resolutions to impeach, or to investigate for potential impeachment, dozens more federal judges, and the House continued, virtually without exception, to provide an express authorization before any committee proceeded to exercise investigative powers.[26] In one 1874 case, the Judiciary Committee realized only after witnesses had traveled from Arkansas that it could not find any resolution granting it compulsory powers to investigate previously referred charges against Judge William Story. *See* 2 Cong. Rec. 1825, 3438 (1874); 3 *Hinds' Precedents* § 2513, at 1023. In order to "cure" that "defect," the committee reported a privileged resolution to the floor of the House that would grant the committee "power to send for persons and papers" as part of the impeachment inves-

---

[26] *See, e.g.*, 3 *Hinds' Precedents* § 2489, at 986 (William Van Ness, Mathias Tallmadge, and William Stephens, 1818); *id.* § 2490, at 987 (Joseph Smith, 1825); *id.* § 2364, at 774 (James Peck, 1830); *id.* § 2492, at 990 (Alfred Conkling, 1830); *id.* § 2491, at 989 (Buckner Thurston, 1837); *id.* § 2494, at 993–94 (P.K. Lawrence, 1839); *id.* §§ 2495, 2497, 2499, at 994, 998, 1003 (John Watrous, 1852–60); *id.* § 2500, at 1005 (Thomas Irwin, 1859); *id.* § 2385, at 805 (West Humphreys, 1862); *id.* § 2503, at 1008 (anonymous justice of the Supreme Court, 1868); *id.* § 2504, at 1008–09 (Mark Delahay, 1872); *id.* § 2506, at 1011 (Edward Durell, 1873); *id.* § 2512, at 1021 (Richard Busteed, 1873); *id.* § 2516, at 1027 (Henry Blodgett, 1879); *id.* §§ 2517–18, at 1028, 1030–31 (Aleck Boarman, 1890–92); *id.* § 2519, at 1032 (J.G. Jenkins, 1894); *id.* § 2520, at 1033 (Augustus Ricks, 1895); *id.* § 2469, at 949–50 (Charles Swayne, 1903); 6 Clarence Cannon, *Cannon's Precedents of the House of Representatives of the United States* § 498, at 685 (1936) (Robert Archbald, 1912); *id.* § 526, at 746–47 (Cornelius H. Hanford, 1912); *id.* § 527, at 749 (Emory Speer, 1913); *id.* § 528, at 753 (Daniel Wright, 1914); *id.* § 529, at 756 (Alston Dayton, 1915); *id.* § 543, at 777–78 (William Baker, 1924); *id.* § 544, at 778–79 (George English, 1925); *id.* § 549, at 789–90 (Frank Cooper, 1927); *id.* § 550, at 791–92 (Francis Winslow, 1929); *id.* § 551, at 793 (Harry Anderson, 1930); *id.* § 552, at 794 (Grover Moscowitz, 1930); *id.* § 513, at 709–10 (Harold Louderback, 1932); 3 *Deschler's Precedents* ch. 14, § 14.4, at 2143 (James Lowell, 1933); *id.* § 18.1, at 2205–06 (Halsted Ritter, 1933); *id.* § 14.10, at 2148 (Albert Johnson and Albert Watson, 1944); H.R. Res. 1066, 94th Cong. (1976) (certain federal judges); H.R. Res. 966, 95th Cong. (1978) (Frank Battisti); *see also* 51 Cong. Rec. 6559–60 (1914) (noting passage of authorizing resolution for investigation of Daniel Wright); 68 Cong. Rec. 3532 (1927) (same for Frank Cooper).

tigation. 2 Cong. Rec. at 3438. The House promptly agreed to the resolution, enabling the committee to "examine" the witnesses that day. *Id.*

In other cases, however, no full investigation ever materialized. In 1803, John Pickering, a district judge, was impeached, but the House voted to impeach him without conducting any investigation at all, relying instead upon documents supplied by President Jefferson. *See* 3 *Hinds' Precedents* § 2319, at 681–82; *see also* Lynn W. Turner, *The Impeachment of John Pickering*, 54 Am. Hist. Rev. 485, 491 (1949). Sometimes, the House authorized only a preliminary inquiry to determine whether an investigation would be warranted. In 1908, for instance, the House asked the Judiciary Committee to consider proposed articles impeaching Judge Lebbeus Wilfley of the U.S. Court for China. In the ensuing hearing, the Representative who had introduced the resolution acknowledged that the committee was not "authorized to subpoena witnesses" and had been authorized to conduct only "a preliminary examination," which was "not like an investigation ordinarily held by the House," but was instead dedicated solely to determining "whether you believe it is a case that ought to be investigated at all."[27] In many other cases, it is apparent that—even when impeachment resolutions had been referred to them—committees conducted no formal investigation.[28]

---

[27] *Articles for the Impeachment of Lebbeus R. Wilfley, Judge of the U.S. Court for China: Hearings Before a Subcomm. of the H. Comm. on the Judiciary*, 60th Cong. 4 (1908) (statement of Rep. Waldo); *see also id.* at 45–46 (statement of Rep. Moon) ("This committee conceives to be its duty solely, under the resolution referring this matter to them, to examine the charges preferred in the petition . . . and to report thereon whether in its judgement the petitioner has made out a prima facie case; and also whether . . . Congress should adopt a resolution instructing the Judiciary Committee to proceed to an investigation of the facts of the case."); 6 *Cannon's Precedents* § 525, at 743–45 (summarizing the Wilfley case, in which the Judiciary Committee ultimately reported that no formal investigation was warranted). The case of Judge Samuel Alschuler in 1935 similarly involved only a preliminary investigation—albeit one with actual investigative powers. The House first referred to the Judiciary Committee a resolution that, if approved, would authorize an investigation of potential impeachment charges. *See* 79 Cong. Rec. 7086, 7106 (1935). Six days later, it adopted a resolution that granted the committee investigative powers in support of "the preliminary examinations deemed necessary" for the committee to make a recommendation about whether a full investigation should occur. *Id.* at 7393–94. The committee ultimately recommended against a full investigation. *See* H.R. Rep. No. 74-1802, at 2 (1935).

[28] *See, e.g.*, 18 Annals of Cong. 1885–86, 2197–98 (1808) (Harry Innes, 1808; the House passed a resolution authorizing an impeachment investigation, which concluded

In 1970, in a rhetorical departure from well-established practice, a sub-committee of the Judiciary Committee described itself as investigating the impeachment of Justice William O. Douglas based solely upon an impeachment resolution referred to the Judiciary Committee. *See* 116 Cong. Rec. 11920, 11942 (1970); 3 *Deschler's Precedents* ch. 14, §§ 14.14–14.16, at 2151–64; *see also* Labovitz, *Presidential Impeachment* at 182 n.18 (noting that "[t]he Douglas inquiry was the first impeachment investigation in twenty-five years, and deviation from the older procedural pattern was not surprising"). Yet, the subcommittee did not resort to any compulsory process during its inquiry, and it did not recommend impeachment. 3 *Deschler's Precedents* ch. 14, §§ 14.15–14.16, at 2158–63. Accordingly, the committee did not actually exercise any of the investigative powers of the House.

In the late 1980s, the House Judiciary Committee considered the impeachment of three district-court judges without any express authorization from the House: Walter Nixon, Alcee Hastings, and Harry Claiborne. *See In re Application of the Comm. on the Judiciary*, 2019 WL 5485221, at *26 (discussing these investigations). All three judges had been criminally prosecuted, and two had been convicted. *See* H.R. Rep. No. 101-36, at 12–13 (1989) (describing Nixon's prosecution and conviction); H.R. Rep. No. 100-810, at 7–8, 29–31, 38–39 (1988) (describing Hastings's indictment and trial and the subsequent decision to proceed with a judicial-misconduct proceeding in lieu of another prosecution); H.R. Rep. No. 99-688, at 9, 17–20 (1986) (describing Claiborne's prosecution and conviction). In the Claiborne inquiry, the committee does not appear to have

---

that the evidence accompanying the resolution did not support impeachment); 3 *Hinds' Precedents* § 2486, at 981–83 (George Turner, 1796; no apparent investigation, presumably because of the parallel criminal prosecution recommended by Attorney General Lee, as discussed above); *id.* § 2488, at 985 (Harry Toulmin, 1811; the House "declined to order a formal investigation"); 40 Annals of Cong. 463–69, 715–18 (1822–23) (Charles Tait, 1823; no apparent investigation beyond examination of documents containing charges); 3 *Hinds' Precedents* § 2493, at 991–92 (Benjamin Johnson, 1833; no apparent investigation); *id.* § 2511, at 1019–20 (Charles Sherman, 1873; the Judiciary Committee received evidence from the Ways and Means Committee, which had been investigating corruption in Congress, but the Judiciary Committee conducted no further investigation); 6 *Cannon's Precedents* § 535, at 769 (Kenesaw Mountain Landis, 1921; the Judiciary Committee reported that "charges were filed too late in the present session of the Congress" to enable investigation); 3 *Deschler's Precedents* ch. 14, § 14.6, at 2144–45 (Joseph Molyneaux, 1934; the Judiciary Committee took no action on the referral of a resolution that would have authorized an investigation).

issued any subpoenas. *See* H.R. Rep. No. 99-688, at 4 (noting that the committee sent "[i]nvitational letters to all witnesses," who apparently cooperated to the Committee's satisfaction). The committee did issue subpoenas in the Nixon and Hastings investigations, yet no witness appears to have objected on the ground that the committee lacked jurisdiction to issue the subpoenas, and at least one witness appears to have requested a subpoena.[29] In those two cases, though, the Judiciary Committee effectively compelled production without any express authorization from the House.[30]

In the years after these outliers, the Judiciary Committee returned to the practice of seeking specific authorization from the House before conducting impeachment investigations. Most notably, as discussed above, the Judiciary Committee "decided that it *must receive authorization from the full House* before proceeding" with an impeachment investigation of President Clinton. H.R. Rep. No. 105-795, at 24 (emphasis added). And the House has used the same practice with respect to federal judges.[31] Thus, in 2008, the House adopted a resolution authorizing the Judiciary Committee to investigate the impeachment of Judge G. Thomas Porteous, Jr., including the grant of subpoena authority. *See* H.R. Rep. No. 111-427, at 7 (2010); H.R. Res. 1448, 110th Cong. (2008); 154 Cong. Rec. 19502 (2008). After the Congress expired, the House in the next Congress

---

[29] *See* H.R. Rep. No. 100-810, at 11 & n.14 (stating that, in the Hastings investigation, a committee subpoena had been issued for William Borders, who challenged the subpoena on First, Fourth, Fifth, and Eighth Amendment grounds); H.R. Rep. No. 100-1124, at 130 (1989) (noting the issuance of "subpoenas *duces tecum*" in the investigation of Judge Nixon); 134 Cong. Rec. 27782 (1988) (statement of Rep. Edwards) (explaining the subcommittee's need to depose some witnesses pursuant to subpoena in the Nixon investigation); *Judge Walter L. Nixon, Jr., Impeachment Inquiry: Hearing Before the Subcomm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary*, 101st Cong. 530–606 (1988) (reprinting deposition of Magistrate Judge Roper).

[30] The House did pass resolutions authorizing funds for investigations with respect to the Hastings impeachment, *see* H.R. Res. 134, 100th Cong. (1987); H.R. Res. 388, 100th Cong. (1988), and resolutions authorizing the committee to permit its counsel to take affidavits and depositions in both the Nixon and Hastings impeachments, *see* H.R. Res. 562, 100th Cong. (1988) (Nixon); H.R. Res. 320, 100th Cong. (1987) (Hastings).

[31] In the post-1989 era, as before, most of the impeachment resolutions against judges that were referred to the Judiciary Committee did not result in any further investigation. *See, e.g.*, H.R. Res. 916, 109th Cong. (2006) (Manuel Real); H.R. Res. 207, 103d Cong. (1993) (Robert Collins); H.R. Res. 177, 103d Cong. (1993) (Robert Aguilar); H.R. Res. 176, 103d Cong. (1993) (Robert Collins).

adopted a new resolution re-authorizing the inquiry, again with subpoena authority. *See* H.R. Res. 15, 111th Cong. (2009); 155 Cong. Rec. 568, 571 (2009). Several months later, another district judge, Samuel Kent, pleaded guilty to obstruction of justice and was sentenced to 35 months of incarceration. *See* H.R. Rep. 111-159, at 9–13 (2009). The House then adopted a resolution directing the Judiciary Committee to investigate impeachment, again specifically granting subpoena authority. *See id.* at 13; H.R. Res. 424, 111th Cong. (2009); 155 Cong. Rec. at 12211–13.

Thus, the House's long-standing and nearly unvarying practice with respect to judicial impeachment inquiries is consistent with the conclusion that the power to investigate in support of the House's "sole Power of Impeachment," U.S. Const. art. I, § 2, cl. 5, may not be exercised by a committee without an express delegation from the House. In the cases of Judges Nixon and Hastings, the Judiciary Committee did exercise compulsory authority despite the absence of any delegation from the House. But insofar as no party challenged the committee's authority at the time, and no court addressed the matter, these historical outliers do not undermine the broader constitutional principle. As the Supreme Court observed in *Noel Canning*, "when considered against 200 years of settled practice," a "few scattered examples" are rightly regarded "as anomalies." 573 U.S. at 538. They do not call into question the soundness of the House's otherwise consistent historical practice, much less the constitutional requirement that a committee exercise the constitutional powers of the House only with an express delegation from the House itself.

## III.

Having concluded that a House committee may not conduct an impeachment investigation without a delegation of authority, we next consider whether the House provided such a delegation to the Foreign Affairs Committee or to the other committees that issued subpoenas pursuant to the asserted impeachment inquiry. During the five weeks between the Speaker's announcement on September 24 and the adoption of Resolution 660 on October 31, the committees issued numerous impeachment-related subpoenas. *See supra* note 9. We therefore provided advice during that period about whether any of the committees had authority to issue those subpoenas. Because the House had not adopted an impeachment resolution, the answer to that question turned on whether the committees could issue those subpoenas based upon any preexisting subpoena authority.

In justifying the subpoenas, the Foreign Affairs Committee and other committees pointed to the resolution adopting the Rules of the House of Representatives, which establish the committees and authorize investigations for matters within their jurisdiction. The committees claimed that Rule XI confers authority to issue subpoenas in connection with an impeachment investigation. Although the House has expanded its committees' authority in recent decades, the House Rules continue to reflect the long-established distinction between legislative and non-legislative investigative powers. Those rules confer legislative oversight jurisdiction on committees and authorize the issuance of subpoenas to that end, but they do not grant authority to investigate for impeachment purposes. While the House committees could have sought some information relating to the same subjects in the exercise of their legislative oversight authority, the subpoenas they purported to issue "pursuant to the House of Representatives' impeachment inquiry" were not in support of such oversight. We therefore conclude that they were unauthorized.

## A.

The standing committees of the House trace their general subpoena powers back to the House Rules, which the 116th Congress adopted by formal resolution. *See* H.R. Res. 6, 116th Cong. (2019). The House Rules are more than 60,000 words long, but they do not include the word "impeachment." The Rules' silence on that topic is particularly notable when contrasted with the Senate, which has adopted specific "Rules of Procedure and Practice" for impeachment trials. S. Res. 479, 99th Cong. (1986).[32] The most obvious conclusion to draw from that silence is that the current House, like its predecessors, retained impeachment authority at the level of the full House, subject to potential delegations in resolutions tailored for that purpose.

Rule XI of the Rules of the House affirmatively authorizes committees to issue subpoenas, but only for matters within their legislative jurisdiction. The provision has been a part of the House Rules since 1975. *See* H.R. Res. 988, 93d Cong. § 301 (1974). Clause 2(m)(1) of Rule XI vests

---

[32] Unlike the House, "the Senate treats its rules as remaining in effect continuously from one Congress to the next without having to be re-adopted." Richard S. Beth, Cong. Research Serv., R42929, *Procedures for Considering Changes in Senate Rules* 9 (Jan. 22, 2013). Of course, like the House, the Senate may change its rules by simple resolution.

each committee with the authority to issue subpoenas "[f ]or the purpose of carrying out any of its functions and duties under this rule and rule X (including any matters referred to it under clause 2 of rule XII)." Rule XI, cl. 2(m)(1); *see also* Rule X, cl. 11(d)(1) (making clause 2 of Rule XI applicable to HPSCI). The committees therefore have subpoena power to carry out their authorities under three rules: Rule X, Rule XI, and clause 2 of Rule XII.

Rule X does not provide any committee with jurisdiction over impeachment. Rule X establishes the "standing committees" of the House and vests them with "their legislative jurisdictions." Rule X, cl. 1. The jurisdiction of each committee varies in subject matter and scope. While the Committee on Ethics, for example, has jurisdiction over only "[t]he Code of Official Conduct" (Rule X, cl. 1(g)), the jurisdiction of the Foreign Affairs Committee spans seventeen subjects, including "[r]elations of the United States with foreign nations generally," "[i]ntervention abroad and declarations of war," and "[t]he American National Red Cross" (Rule X, cl. 1(i)(1), (9), (15)). The rule likewise spells out the jurisdiction of the Committee on Oversight and Reform (Rule X, cl. 1(n), cl. 3(i)), and the jurisdiction of the Judiciary Committee (Rule X, cl. 1(*l* )). Clause 11 of Rule X establishes HPSCI and vests it with jurisdiction over "[t]he Central Intelligence Agency, the Director of National Intelligence, and the National Intelligence Program" and over "[i]ntelligence and intelligence-related activities of all other departments and agencies." Rule X, cl. 11(a)(1), (b)(1)(A)–(B).

The text of Rule X confirms that it addresses the *legislative* jurisdiction of the standing committees. After defining each standing committee's subject-matter jurisdiction, the Rule provides that "[t]he various standing committees shall have general oversight responsibilities" to assist the House in its analysis of "the application, administration, execution, and effectiveness of Federal laws" and of the "conditions and circumstances that may indicate the necessity or desirability of enacting new or additional legislation," as well as to assist the House in its "formulation, consideration, and enactment of changes in Federal laws, and of such additional legislation as may be necessary or appropriate." Rule X, cl. 2(a)(1)–(2). The committees are to conduct oversight "on a continuing basis" "to determine whether laws and programs addressing subjects within the jurisdiction of a committee" are implemented as Congress intends "and whether they should be continued, curtailed, or eliminated." Rule X, cl. 2(b)(1). Those are all functions traditionally associated with legislative

oversight, not the separate power of impeachment. *See supra* Part II.A. Clause 3 of Rule X further articulates "[s]pecial oversight functions" with respect to particular subjects for certain committees; for example, the Committee on Foreign Affairs "shall review and study on a continuing basis laws, programs, and Government activities relating to . . . intelligence activities relating to foreign policy," Rule X, cl. 3(f). And clause 4 addresses "[a]dditional functions of committees," including functions related to the review of appropriations and the special authorities of the Committee on Oversight and Reform, Rule X, cl. 4(a)(1), (c)(1). But none of the "[s]pecial oversight" or "[a]dditional" functions specified in clauses 3 and 4 includes any reference to the House's impeachment power.

The powers of HPSCI are addressed in clause 11 of Rule X. Unlike the standing committees, HPSCI is not given "[g]eneral oversight responsibilities" in clause 2. But clause 3 gives it the "[s]pecial oversight functions" of "review[ing] and study[ing] on a continuing basis laws, programs, and activities of the intelligence community" and of "review[ing] and study[ing] . . . the sources and methods of" specified entities that engage in intelligence activities. Rule X, cl. 3(m). And clause 11 further provides that proposed legislation about intelligence activities will be referred to HPSCI and that HPSCI shall report to the House "on the nature and extent of the intelligence and intelligence-related activities of the various departments and agencies of the United States." Rule X, cl. 11(b)(1), (c)(1); *see also* H.R. Res. 658, 95th Cong. § 1 (1977) (resolution establishing HPSCI, explaining its purpose as "provid[ing] vigilant *legislative oversight* over the intelligence and intelligence-related activities of the United States" (emphasis added)). Again, those powers sound in legislative oversight, and nothing in the Rules suggests that HPSCI has any generic delegation of the separate power of impeachment.

Consistent with the foregoing textual analysis, Rule X has been seen as conferring legislative oversight authority on the House's committees, without any suggestion that impeachment authorities are somehow included therein. The Congressional Research Service describes Rule X as "contain[ing] the legislative and oversight jurisdiction of each standing committee, several clauses on committee procedures and operations, and a clause specifically addressing the jurisdiction and operation of the Permanent Select Committee on Intelligence." Michael L. Koempel & Judy Schneider, Cong. Research Serv., R41605, *House Standing Committees' Rules on Legislative Activities: Analysis of Rules in Effect in the 114th Congress* 2 (Oct. 11, 2016); *see also* Dolan, *Congressional Oversight*

*Manual* at 25 (distinguishing a committee inquiry with "a legislative purpose" from inquiries conducted under "some other constitutional power of Congress, such as the authority" to "conduct impeachment proceedings"). In the chapter of *Deschler's Precedents* devoted to explaining the "[i]nvestigations and [i]nquiries" by the House and its committees, the Parliamentarian repeatedly notes that impeachment investigations and other non-legislative powers are discussed elsewhere. *See* 4 *Deschler's Precedents* ch. 15, § 1, at 2283; *id.* § 14, at 2385 n.12; *id.* § 16, at 2403 & n.4.

Rule X concerns only legislative oversight, and Rule XI does not expand the committees' subpoena authority any further. That rule rests upon the jurisdiction granted in Rule X. *See* Rule XI, cl. 1(b)(1) ("Each committee may conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities under rule X."). Nor does Rule XII confer any additional jurisdiction. Clause 2(a) states that "[t]he Speaker shall refer each bill, resolution, or other matter that relates to a subject listed under a standing committee named in clause 1 of rule X[.]" Rule XII, cl. 2(a). The Speaker's referral authority under Rule XII is thus limited to matters within a committee's Rule X legislative jurisdiction. *See* 18 *Deschler's Precedents* app. at 578 ("All committees were empowered by actual language of the Speaker's referral to consider only 'such provisions of the measure as fall within their respective jurisdictions under Rule X.'"). Accordingly, the Speaker may not expand the jurisdiction of a committee by referring a bill or resolution falling outside the committee's Rule X authority.[33]

In reporting Resolution 660 to the House, the Rules Committee expressed the view that clause 2(m) of Rule XI gave standing committees the authority to issue subpoenas in support of impeachment inquiries. *See* H.R. Rep. No. 116-266, at 18 (2019). But the committee did not explain which terms of the rule provide such authority. To the contrary, the committee simply asserted that the rule granted such authority and that the text of Resolution 660 departed from its predecessors on account of amendments to clause 2(m) that were adopted after the "Clinton and

---

[33] Nor do the Rules otherwise give the Speaker the authority to order an investigation or issue a subpoena in connection with impeachment. Rule I sets out the powers of the Speaker. She "shall sign . . . all writs, warrants, and subpoenas of, or issued by order of, the House." Rule I, cl. 4. But that provision applies only when the House itself issues an order. *See Jefferson's Manual* § 626, at 348.

Nixon impeachment inquiry resolutions." *Id.* Yet clause 2(m) of Rule XI was adopted two decades before the Clinton inquiry.[34] Even with that authority in place, the Judiciary Committee recognized in 1998 that it "*must* receive authorization from the full House before proceeding" to investigate President Clinton for impeachment purposes. H.R. Rep. No. 105-795, at 24 (emphasis added). And, even before Rule XI was adopted, the House had conferred on the Judiciary Committee a materially similar form of investigative authority (including subpoena power) in 1973.[35] The Judiciary Committee nevertheless recognized that those subpoena powers did not authorize it to conduct an impeachment inquiry about President Nixon. In other words, the Rules Committee's recent interpretation of clause 2(m) (which it did not explain in its report) cannot be reconciled with the Judiciary Committee's well-reasoned conclusion, in both 1974 and 1998, that Rule XI (and its materially similar predecessor) do not confer any standing authority to conduct an impeachment investigation.

In modern practice, the Speaker has referred proposed resolutions calling for the impeachment of a civil officer to the Judiciary Committee. *See Jefferson's Manual* § 605, at 324. Consistent with this practice, the Speaker referred the Sherman resolution (H.R. Res. 13, 116th Cong.) to the Judiciary Committee, because it called for the impeachment of President Trump. Yet the referral itself did not grant authority to conduct an impeachment investigation. House committees have regularly received referrals and conducted preliminary inquiries, without compulsory pro-

---

[34] Clause 2(m) of Rule XI was initially adopted on October 8, 1974, and took effect on January 3, 1975. *See* H.R. Res. 988, 93d Cong. The rule appears to have remained materially unchanged from 1975 to the present (including during the time of the Clinton investigation). *See* H.R. Rule XI, cl. 2(m), 105th Cong. (Jan. 1, 1998) (version in effect during the Clinton investigation); *Jefferson's Manual* § 805, at 586–89 (reprinting current version and describing the provision's evolution).

[35] At the start of the 93rd Congress in 1973, the Judiciary Committee was "authorized to conduct full and complete studies and investigations and make inquiries within its jurisdiction as set forth in [the relevant provision] of the Rules of the House of Representatives" and was empowered "to hold such hearings and require, by subpena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memorandums, papers, and documents, as it deems necessary." H.R. Res. 74, 93d Cong. §§ 1, 2(a) (1973); *see also* Cong. Research Serv., R45769, *The Impeachment Process in the House of Representatives* 4 (updated Nov. 14, 2019) (noting that, before Rule XI vested subpoena power in standing committees, the Judiciary Committee and other committees had often been given subpoena authority "through resolutions providing blanket investigatory authorities that were agreed to at the start of a Congress").

cess, for the purpose of determining whether to recommend that the House open a formal impeachment investigation. *See supra* Part II.C. Should a committee determine that a formal inquiry is warranted, then the committee recommends that the House adopt a resolution that authorizes such an investigation, confers subpoena power, and provides special process to the target of the investigation. The Judiciary Committee followed precisely that procedure in connection with the impeachment investigations of Presidents Nixon and Clinton, among many others. By referring an impeachment resolution to the House Judiciary Committee, the Speaker did not expand that committee's subpoena authority to cover a formal impeachment investigation. In any event, no impeachment resolution was ever referred to the Foreign Affairs Committee, HPSCI, or the Committee on Oversight and Reform. Rule XII thus could not provide any authority to those committees in support of the impeachment-related subpoenas issued before October 31.

Accordingly, when those subpoenas were issued, the House Rules did not provide authority to any of those committees to issue subpoenas in connection with potential impeachment. In reaching this conclusion, we do not question the broad authority of the House of Representatives to determine how and when to conduct its business. *See* U.S. Const. art. I, § 5, cl. 2. As the Supreme Court has recognized, "'all matters of method are open to the determination'" of the House, "as long as there is 'a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained,' and the rule does not 'ignore constitutional restraints or violate fundamental rights.'" *Noel Canning*, 573 U.S. at 551 (quoting *United States v. Ballin*, 144 U.S. 1, 5 (1892)). The question, however, is not "what rules Congress may establish for its own governance," but "rather what rules the House has established and whether they have been followed." *Christoffel v. United States*, 338 U.S. 84, 88–89 (1949); *see also Yellin v. United States*, 374 U.S. 109, 121 (1963) (stating that a litigant "is at least entitled to have the Committee follow its rules and give him consideration according to the standards it has adopted in" the relevant rule); *United States v. Smith*, 286 U.S. 6, 33 (1932) ("As the construction to be given to the rules affects persons other than members of the Senate, the question presented is of necessity a judicial one."). Statements by the Speaker or by committee chairmen are not statements of the House itself. *Cf. Noel Canning*, 573 U.S. at 552–53 (relying on statements and actions of the Senate itself, as reflected in the Journal of the Senate and the Congressional Record, to determine when

the Senate was "in session"). Our conclusion here turned upon nothing more, and nothing less, than the rules and resolutions that had been adopted by a majority vote of the full House.[36]

The text of those provisions determined whether the House had delegated the necessary authority. *See id.* at 552 ("[O]ur deference to the Senate cannot be absolute. When the Senate is without the *capacity* to act, under its own rules, it is not in session even if it so declares."). Thus, the Supreme Court has repeatedly made clear that a target of the House's compulsory process may question whether a House resolution has actually conferred the necessary powers upon a committee, because the committee's "right to exact testimony and to call for the production of documents must be found in [the resolution's] language." *Rumely*, 345 U.S. at 44; *see also Watkins*, 354 U.S. at 201. In *Rumely*, the Court expressly rejected the argument that the House had confirmed the committee's jurisdiction by adopting a resolution that merely held the witness in contempt after the fact. As the Court explained, what was said "after the controversy had arisen regarding the scope of the resolution . . . had the usual infirmity of *post litem motam*, self-serving declarations." 345 U.S. at 48. In other words, even a vote of the full House could not "enlarge[]" a committee's authority after the fact for purposes of finding that a witness had failed to comply with the obligations imposed by the subpoena. *Id.*

Here, the House committees claiming to investigate impeachment issued subpoenas before they had received *any* actual delegation of impeachment-related authority from the House. Before October 31, the committees relied solely upon statements of the Speaker, the committee chairmen, and the Judiciary Committee, all of which merely asserted that one or more House committees had already been conducting a formal impeachment inquiry. There was, however, no House resolution actually delegating such authority to any committee, let alone one that did so with

---

[36] The Judiciary Committee has also invoked House Resolution 430 as an independent source of authority for an impeachment inquiry. *See* Tr. of Mot. Hrg. at 91–92, *In re Application of the Comm. on the Judiciary; see also* Majority Staff of H. Comm. on the Judiciary, 116th Cong., *Constitutional Grounds for Presidential Impeachment* 39 (Dec. 2019). As discussed above, however, that resolution did not confer any investigative authority. Rather, it granted "any and all necessary authority under Article I" only "in connection with" certain "judicial proceeding[s]" in federal court. H.R. Res. 430, 116th Cong. (2019); *see supra* note 7. The resolution therefore had no bearing on any committee's authority to compel the production of documents or testimony in an impeachment investigation.

"sufficient particularity" to compel witnesses to respond. *Watkins*, 354 U.S. at 201; *cf. Gojack v. United States*, 384 U.S. 702, 716–17 (1966). At the opening of this Congress, the House had not chosen to confer investigative authority over impeachment upon any committee, and therefore, no House committee had authority to compel the production of documents or testimony in furtherance of an impeachment inquiry that it was not authorized to conduct.

## B.

Lacking a delegation from the House, the committees could not compel the production of documents or the testimony of witnesses for purposes of an impeachment inquiry. Because the first impeachment-related subpoena —the September 27 subpoena from the Foreign Affairs Committee— rested entirely upon the purported impeachment inquiry, *see* Three Chairmen's Letter, *supra* note 2, at 1, it was not enforceable. *See, e.g.*, *Rumely*, 345 U.S. at 44. Perhaps recognizing this infirmity, the committee chairmen invoked not merely the impeachment inquiry in connection with subsequent impeachment-related subpoenas but also the committees' "oversight and legislative jurisdiction." *See supra* note 9 and accompanying text. That assertion of dual authorities presented the question whether the committees could leverage their oversight jurisdiction to require the production of documents and testimony that the committees avowedly intended to use for an unauthorized impeachment inquiry. We advised that, under the circumstances of these subpoenas, the committees could not do so.

Any congressional inquiry "must be related to, and in furtherance of, a legitimate task of the Congress." *Watkins*, 354 U.S. at 187. The Executive Branch need not presume that such a purpose exists or accept a "makeweight" assertion of legislative jurisdiction. *Mazars USA*, 940 F.3d at 725–26, 727; *see also Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968) ("In deciding whether the purpose is within the legislative function, the mere assertion of a need to consider 'remedial legislation' may not alone justify an investigation accompanied with compulsory process[.]"). Indeed, "an assertion from a committee chairman may not prevent the Executive from confirming the legitimacy of an investigative request." *Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)*, 43 Op. O.L.C. __, at *20 (June 13, 2019). To the contrary, "a threshold inquiry that should be made upon

receipt of any congressional request for information is whether the request is supported by any legitimate legislative purpose." *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 74 (1986); *see also Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 159 (1989) (recognizing that the constitutionally mandated accommodation process "requires that each branch explain to the other why it believes its needs to be legitimate").

Here, the committee chairmen made clear upon issuing the subpoenas that the committees were interested in the requested materials to support an investigation into the potential impeachment of the President, not to uncover information necessary for potential legislation within their respective areas of legislative jurisdiction. In marked contrast with routine oversight, each of the subpoenas was accompanied by a letter signed by the chairs of three different committees, who transmitted a subpoena "[p]ursuant to the House of Representatives' impeachment inquiry" and recited that the documents would "be collected as part of the House's impeachment inquiry," and that they would be "shared among the Committees, as well as with the Committee on the Judiciary as appropriate." *See supra* note 9 and accompanying text. Apart from their token invocations of "oversight and legislative jurisdiction," the letters offered no hint of any legislative purpose. The committee chairmen were therefore seeking to do precisely what they said—compel the production of information to further an impeachment inquiry.

In reaching this conclusion, we do not foreclose the possibility that the Foreign Affairs Committee or the other committees could have issued similar subpoenas in the bona fide exercise of their legislative oversight jurisdiction, in which event the requests would have been evaluated consistent with the long-standing confidentiality interests of the Executive Branch. *See Watkins*, 354 U.S. at 187 (recognizing that Congress's general investigative authority "comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste"); *McGrain*, 273 U.S. at 179–80 (observing that it is not "a valid objection to the investigation that it might possibly disclose crime or wrongdoing on [the Attorney General's] part"). Should the Foreign Affairs Committee, or another committee, articulate a legitimate oversight purpose for a future information request, the Executive Branch would assess that request as part of the constitutionally required accommodation process. But the Executive Branch was not confronted with that situation. The committee

chairmen unequivocally attempted to conduct an impeachment inquiry into the President's actions, without the House, which has the "sole Power of Impeachment," having authorized such an investigation. Absent such an authorization, the committee chairs' passing mention of "oversight and legislative jurisdiction" did not cure that fundamental defect.

## C.

We next address whether the House ratified any of the previous committee subpoenas when it adopted Resolution 660 on October 31, 2019—after weeks of objections from the Executive Branch and many members of Congress to the committees' efforts to conduct an unauthorized impeachment inquiry. Resolution 660 provides that six committees of the House "are directed to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America." Resolution 660, § 1. The resolution further prescribes certain procedures by which HPSCI and the Judiciary Committee may conduct hearings in connection with the investigation defined by that resolution.

Resolution 660 does not speak at all to the committees' past actions or seek to ratify any subpoena previously issued by the House committees. *See Trump v. Mazars USA, LLP*, 941 F.3d 1180, 1182 (D.C. Cir. 2019) (Rao, J., dissenting from the denial of rehearing en banc); *see also Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __, at *5 (Nov. 1, 2019). The resolution "direct[s]" HPSCI and other committees to "continue" their investigations, and the Rules Committee apparently assumed, incorrectly in our view, that earlier subpoenas were legally valid. *See* H.R. Rep. No. 116-266, at 3 ("All subpoenas to the Executive Branch remain in full force."). But the resolution's operative language does not address any previously issued subpoenas or provide the imprimatur of the House to give those subpoenas legal force.

And the House knows how to ratify existing subpoenas when it chooses to do so.[37] On July 24, 2019, the House adopted a resolution that express-

___

[37] Even if the House had sought to ratify a previously issued subpoena, it could give that subpoena only prospective effect. As discussed above, the Supreme Court has recognized that the House may not cite a witness for contempt for failure to comply with

ly "ratif[ied] and affirm[ed] all current and future investigations, as well as *all subpoenas previously issued* or to be issued in the future," related to certain enumerated subjects within the jurisdiction of standing or select committees of the House "as established by the Constitution of the United States and rules X and XI of the Rules of the House of Representatives." H.R. Res. 507, 116th Cong. § 1 (2019) (emphasis added). There, as here, the House acted in response to questions regarding "the validity of . . . [committee] investigations and subpoenas." *Id*. pmbl. Despite that recent model, Resolution 660 contains no comparable language seeking to ratify previously issued subpoenas. The resolution directs certain committees to "continue" investigations, and it specifies procedures to govern future hearings, but nothing in the resolution looks backward to actions previously taken. Accordingly, Resolution 660 did not ratify or otherwise authorize the impeachment-related subpoenas issued before October 31, which therefore still had no compulsory effect on their recipients.

## IV.

Finally, we address some of the consequences that followed from our conclusion that the committees' pre-October 31 impeachment-related subpoenas were unauthorized. First, because the subpoenas exceeded the committees' investigative authority and lacked compulsory effect, the committees were mistaken in contending that the recipients' "failure or refusal to comply with the subpoena [would] constitute evidence of obstruction of the House's impeachment inquiry." Three Chairmen's Letter, *supra* note 2, at 1.[38] As explained at length above, when the subpoenas were issued, there was no valid impeachment inquiry. To the extent that the committees' subpoenas sought information in support of an unauthorized impeachment inquiry, the failure to comply with those subpoenas was no more punishable than were the failures of the witnesses in *Watkins*, *Rumely*, *Kilbourn*, and *Lamont* to answer questions that were beyond

---

a subpoena unsupported by a valid delegation of authority at the time it was issued. *See Rumely*, 345 U.S. at 48; *see also Exxon*, 589 F.2d at 592 ("To issue a valid subpoena, . . . a committee or subcommittee must conform strictly to the resolution establishing its investigatory powers[.]").

[38] The letters accompanying other subpoenas, *see supra* note 9, contained similar threats that the recipients' "failure or refusal to comply with the subpoena, including at the direction or behest of the President," would constitute "evidence of obstruction of the House's impeachment inquiry."

the scope of those committees' authorized jurisdiction. *See Watkins*, 354 U.S. at 206, 215 (holding that conviction for contempt of Congress was invalid because, when the witness failed to answer questions, the House had not used sufficient "care . . . in authorizing the use of compulsory process" and the committee had not shown that the information was pertinent to a subject within "the mission[] delegated to" it by the House); *Rumely*, 345 U.S. at 42–43, 48 (affirming reversal of conviction for contempt of Congress because it was not clear at the time of questioning that "the committee was authorized to exact the information which the witness withheld"); *Kilbourn*, 103 U.S. at 196 (sustaining action brought by witness for false imprisonment because the committee "had no lawful authority to require Kilbourn to testify as a witness beyond what he voluntarily chose to tell"); *Lamont*, 18 F.R.D. at 37 (dismissing indictment for contempt of Congress in part because the indictment did not sufficiently allege, among other things, "that the [Permanent Subcommittee on Investigations] . . . was duly empowered by either House of Congress to conduct the particular inquiry" or "that the inquiry was within the scope of the authority granted to the [sub]committee"). That alone suffices to prevent noncompliance with the subpoenas from constituting "obstruction of the House's impeachment inquiry."

Second, we note that whether or not the impeachment inquiry was authorized, there were other, independent grounds to support directions by the Executive Branch that witnesses not appear in response to the committees' subpoenas. We recently advised you that executive privilege continues to be available during an impeachment investigation. *See Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __, at *2–5. The mere existence of an impeachment investigation does not eliminate the President's need for confidentiality in connection with the performance of his duties. Just as in the context of a criminal trial, a dispute over a request for privileged information in an impeachment investigation must be resolved in a manner that "preserves the essential functions of each branch." *United States v. Nixon*, 418 U.S. 683, 707 (1974). Thus, while a committee "may be able to establish an interest justifying its requests for information, the Executive Branch also has legitimate interests in confidentiality, and the resolution of these competing interests requires a careful balancing of each branch's need in the context of the particular information sought." *Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __, at *4.

Accordingly, we recognized, in connection with HPSCI's impeachment investigation after October 31, that the committee may not compel an executive branch witness to appear for a deposition without the assistance of agency counsel, when that counsel is necessary to assist the witness in ensuring the appropriate protection of privileged information during the deposition. *See id.* at *4–5. In addition, we have concluded that the testimonial immunity of the President's senior advisers "applies in an impeachment inquiry just as it applies in a legislative oversight inquiry." Letter for Pat A. Cipollone, Counsel to the President, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel at 2 (Nov. 3, 2019).

Thus, even when the House takes the steps necessary to authorize a committee to investigate impeachment and compel the production of needed information, the Executive Branch continues to have legitimate interests to protect. The Constitution does not oblige either branch of government to surrender its legitimate prerogatives, but expects that each branch will negotiate in good faith with mutual respect for the needs of the other branch. *See United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977) ("[E]ach branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation."); *see also* Memorandum for the Heads of Executive Departments and Agencies from President Ronald Reagan, *Re: Procedures Governing Responses to Congressional Requests for Information* (Nov. 4, 1982). The two branches should work to identify arrangements in the context of the particular requests of an investigating committee that accommodate both the committee's needs and the Executive Branch's interests.

For these reasons, the House cannot plausibly claim that any executive branch official engaged in "obstruction" by failing to comply with committee subpoenas, or directing subordinates not to comply, in order to protect the Executive Branch's legitimate interests in confidentiality and the separation of powers. We explained thirty-five years ago that "the Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 140 (1984). Nor may Congress "utilize its inherent 'civil' contempt powers to

arrest, bring to trial, and punish an executive official who assert[s] a Presidential claim of executive privilege." *Id.* at 140 n.42. We have re-affirmed those fundamental conclusions in each of the subsequent decades.[39]

The constitutionally required accommodation process, of course, is a two-way street. In connection with this investigation, the House committees took the unprecedented steps of investigating the impeachment of a President without any authorization from the full House; without the procedural protections provided to Presidents Nixon and Clinton, *see supra* note 12; and with express threats of obstruction charges and unconstitutional demands that officials appear and provide closed-door testimony about privileged matters without the assistance of executive branch counsel. Absent any effort by the House committees to accommodate the Executive Branch's legitimate concerns with the unprecedented nature of the committees' actions, it was reasonable for executive branch officials to decline to comply with the subpoenas addressed to them.

## V.

For the reasons set forth above, we conclude that the House must expressly authorize a committee to conduct an impeachment investigation and to use compulsory process in that investigation before the committee

---

[39] *See, e.g.*, *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *14 (May 23, 2019) ("[I]t would be unconstitutional to enforce a subpoena against an agency employee who declined to appear before Congress, at the agency's direction, because the committee would not permit an agency representative to accompany him."); *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __, at *20 (May 20, 2019) ("The constitutional separation of powers bars Congress from exercising its inherent contempt power in the face of a presidential assertion of executive privilege."); *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 65–69 (2008) (concluding that the Department cannot take "prosecutorial action, with respect to current or former White House officials who . . . declined to appear to testify, in response to subpoenas from a congressional committee, based on the President's assertion of executive privilege"); *Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995) ("[T]he criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege."); *see also Authority of Agency Officials to Prohibit Employees from Providing Information to Congress*, 28 Op. O.L.C. 79, 80–82 (2004) (explaining that the Executive Branch has the constitutional authority to supervise its employees' disclosure of privileged and other information to Congress).

may compel the production of documents or testimony in support of the House's "sole Power of Impeachment." U.S. Const. art. I, § 2, cl. 5. The House had not authorized such an investigation in connection with the impeachment-related subpoenas issued before October 31, 2019, and the subpoenas therefore had no compulsory effect. The House's adoption of Resolution 660 did not alter the legal status of those subpoenas, because the resolution did not ratify them or otherwise address their terms.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*